the act of congress, has restrained the jurisdiction of the court in the supposed cases. The only answer to the question is, that the want of jurisdiction is the result of certain general principles of law, acting upon the particular subject. In like manner, the jurisdiction of these courts, when sitting in an admiralty or prize cause, is limited by those general principles which apply to courts of admiralty in England and the Uniteu States, as well as in other countries. Though bounded only by the nature of the causes over which they are to decide, and not in any respect by place; it is nevertheless essential to the exercise of this jurisdiction by any particular court, that the person or thing against whom or which the court proceeds, should be within the local jurisdiction of such court. Such was the jurisdiction of the several vice-admiralty courts of Great Britain, in America, and the West Indies, until the statute of the 41st of George III., which, whether sitting as instance or prize courts, were confined to breaches of the revenue laws, committed within their local jurisdictions, and to cases of vessels, &c., brought within their local jurisdiction. The only exception to the general rule above stated, applicable to the court of admiralty, in prize causes, is that of a vessel lying in the port of a neutral country, most unwillingly assented to by Sir W. Scott, under the sanction of precedents, but powerfully opposed by the reasons urged against it by that distinguished judge. But even in that case, it was never pretended that the process of the court, could go into the neutral country, to compel an appearance, or to enforce the execution of the sentence.

But secondly, the jurisdiction of these courts in prize causes, is limited, as to persons, by the express provisions of the 11th section of the judiciary law before referred to. Prize proceeding against an inhabitant of the United States, is unquestionably a civil suit; and if it be against the person, instead of the thing, the jurisdiction is excluded, unless it be instituted in the court of the district whereof he is an inhabitant, or is found at the time of serving the process. The manifest policy of the judicial system of the United States, was, to render the administration of justice as little oppressive to suitors and others as possible; and it corresponds entirely with that construction, which confines the process of the courts within the limits of the district in which the court sits, and from which it issued.

In the exercise of a jurisdiction over persons not inhabitants of, or found within the district where the suit is brought, there are difficulties, which, in the opinion of the court, nothing but an act of congress can remove. In what manner, for instance, is the marshal to dispose of the person? He has no authority to conduct him beyond the limits of his district, nor to deliver him over to the marshal of an adjoining district, for that

purpose. Can he commit him to the gaol of the district where the arrest was made? If he can, the case would present a very extraordinary novelty in jurisprudence—that of a defendant, imprisoned in one district, to answer to a suit depending against him in another, how great soever the distance of the one place might be from the other. In criminal cases, where the offender is arrested in one district, for trial in another, the 33d section of the judicial law has provided, not only for the removal of the offender and witnesses, but also for the transmission of the process and recognizance, taken in the case, to the proper court. In like manner, should it be the will of congress to vest in the courts of the United States an extra-territorial jurisdiction in prize causes, over persons and things found in a district other than that from which the process issued, it would seem to be proper, if not absolutely necessary, at the same time to prescribe the mode of executing the process. Upon the whole, we are of opinion, that the petitioner ought to be discharged.

---

## Case No. 5,658.

### Ex parte GRAHAM.

[See Case No. 5,657.]

---

## Case No. 5,659.

### In re GRAHAM.

[8 Ben. 419] [1]

District Court, S. D. New York.   May, 1876.

#### WITNESS—PRIVILEGE—CRIMINATION.

It having been testified in bankruptcy proceedings, that the bankrupt had lost a large sum of money, a short time before his bankruptcy, in a gambling-house kept by B. and M. at No. 16 West 24th street, New York. B. and M. were summoned to appear before the register for examination. The question was put to B.: "What year was it you removed from No. 16 West 24th street?" B. refused to answer, on the ground that the answer to the question would tend to criminate him. The question was put to M.: "Did you ever reside at No. 16 West 24th street?" M. refused to answer on the same ground: *Held*, that the witnesses were privileged from answering the questions.

[Cited in U. S. v. M'Carthy, 18 Fed. 88.]

In this case the register certified that a witness had testified before him that one Samuel E. Briggs and one Charles N. Moody were the keepers of a gambling-house at No. 16 West 24th street, in the city of New York; that the above named bankrupt [William M. Graham] had lost at gaming, in said house, over $30,000, which he had paid to Briggs and Moody a short time before the adjudication of bankruptcy; that thereafter a summons was issued by the register requiring Briggs and Moody to come before him for examination; and that, they ·having been

[1] [Reported by Robert D. Benedict, Esq., and Benjamin Lincoln Benedict, Esq., and here reprinted by permission.]

sworn, the following question was put to the witness Briggs: "What year was it you removed from No. 16 West 24th street?" who answered, that, from the previous examination of witnesses, he perceived that he was charged with participation in a gambling transaction, which, if true, exposed him to a criminal prosecution under the laws of the state of New York, and he declined to answer any question on the subject, on the ground that the answer to the question now put might tend to expose him to such criminal prosecution and criminate him. The register further certified, that the following question was put to the witness Moody: "Did you ever reside at No. 16 West 24th street?" that he made the same answer as the witness Briggs; and that the register thereupon, on request, certified to the court the question, whether the witnesses should answer, with his opinion that the witnesses should be required to answer the questions.

BLATCHFORD, District Judge. I think that the witnesses were privileged from answering the questions.

## Case No. 5,660.

### In re GRAHAM.

[2 Biss. 449; 4 Alb. Law J. 49.] [1]

District Court, W. D. Wisconsin.   Feb., 1871.

EXEMPTIONS —NONE IN PROPERTY FRAUDULENTLY CONVEYED.

1. A family sewing machine is properly exempt under the 14th section of the bankrupt act [of 1867, (14 Stat. 522)].

2. A watch, not being exempt by the statute of the state, does not properly come within the discretionary articles contemplated by that section.

[Cited in Re Steele, Case No. 13,346.]

[Cited in Stewart v. McClung, 12 Or. 431, 8 Pac. 447.]

3. In property conveyed by the bankrupt in fraud of creditors prior to the filing of the petition against him, and afterwards recovered to the estate, he cannot claim any exemptions. The sale is good as against him. In attempting to place his property beyond the reach of his creditors he has placed his exemptions beyond his own reach.

4. In the list of exemptions the value of the articles set apart should be stated, so that it may be seen whether they come within the limitations of the act.

In bankruptcy. Petition by the bankrupt for an order directing the assignee to add to the list of exempt property set off to him, one family sewing machine, one silver watch, one single sleigh, one harness, one manufacturer's sewing machine, one horse and one buggy.

S. J. Todd, for assignee.

A. L. Sanborn, for bankrupt.

HOPKINS, District Judge. I think that the family sewing machine is exempt, and the assignee should set it off to the bank-

rupt.   Section 1, c. 192, Laws Wis. 1860. The watch is not exempt by the state law, and does not properly come within the discretionary articles contemplated by section 14 of the bankrupt act.   The bankrupt, it appears, had disposed of the sleigh, harness, and manufacturer's sewing machine to one Hanlon, before the filing of the petition in this case, and it was not claimed that he had re-purchased them, so that he clearly has no right to them.

The bankrupt, about the 12th of September, 1870, sold all his stock in trade and tools as a harness maker, three horses, three buggies, and a lot of cattle and other property, to one Hanlon, at the price of $3,684, for which he took his notes in equal amounts at one, two, and three years.   A detailed bill of sale was made of the articles and price of each, in which the manufacturer's sewing machine was valued at $100, netting machine $300, and other tools $175, in all $575, all of which he now claims as exempt as mechanic's tools.   By the state statute a mechanic's exemptions of tools is limited to·$200 in value, so that if there was no question as to his right to the exemption to the amount allowed by the statute, he would not be entitled to the netting machine, for that alone exceeds in value the amount allowed; nor would he be entitled to the sewing machine, unless he gave up about $75 worth of his other tools, for together they exceed the statute allowance by that sum.

But I think the proof clearly shows that these articles were all sold by the bankrupt to Hanlon before filing the petition in bankruptcy, and he is not, therefore, entitled to them, whether exempt or not.   That ·sale was unquestionably made to hinder and delay creditors, and was void, but the bankrupt is not permitted to impeach it; the sale as to him is good, and by it he parted irrevocably with all his interest in the property covered by the bill of sale.

The bankrupt claims that he bought back the horses, buggies and cattle before the filing of the petition in bankruptcy, or that the trade, so far as they were concerned, was abandoned, and that he allowed $1,600 upon the note for the purchase price.   These articles were sold to Hanlon for $1,195, and why he should have taken them back at $1,600 is not explained.   The re-sale of this property is attempted to be sustained by Graham's and Hanlon's testimony taken before the register.   They agree as to the terms and circumstances of the sale, and show the transaction to have been a gross fraud upon the creditors.   They agree substantially, also, as to the fact of the re-sale, but no explanation is given of the discrepancy between the price they were sold for, and taken back at on the day following the sale; their notes are not produced to show whether they were indorsed or not, and Hanlon swears that he told the marshal and one Dewey the day he took the property that the horse was his.

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.  4 Alb. Law J. 49, contains only a partial report.]