MURPHY ET AL. *v.* WATERFRONT COMMISSION
OF NEW YORK HARBOR.

No. 138. Argued March 5, 1964.—Decided June 15, 1964.

*Harold Krieger* argued the cause and filed briefs for petitioners.

*William P. Sirignano* argued the cause for respondent. With him on the brief was *Irving Malchman*.

Briefs of *amici curiae,* urging affirmance, were filed by *Louis J. Lefkowitz,* Attorney General of New York, *Samuel A. Hirshowitz,* First Assistant Attorney General, *Irving Galt,* Assistant Solicitor General, and *Barry Mahoney,* Deputy Assistant Attorney General, for the State of New York; and by *H. Richard Uviller* and *Michael ·R. Juviler* for the National District Attorneys' Association.

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

We have held today that the Fifth Amendment privilege against self-incrimination must be deemed fully applicable to the States through the Fourteenth Amendment. *Malloy* v. *Hogan, ante,* p. 1. This case presents a related issue: whether one jurisdiction within our federal structure may compel a witness, whom it has immunized from prosecution under its laws, to give testimony which might then be used to convict him of a crime against another such jurisdiction.[1]

Petitioners were subpoenaed to testify at a hearing conducted by the Waterfront Commission of New York Harbor concerning a work stoppage at the Hoboken, New Jersey, piers. After refusing to respond to certain questions about the stoppage on the ground that the answers might tend to incriminate them, petitioners were granted immunity from prosecution under the laws of New Jersey and New York.[2] Notwithstanding this grant of immunity, they still refused to respond to the questions on the

---

[1] Since the privilege is now fully applicable to the State and to the Federal Government, the basic issue is the same whether the testimony is compelled by the Federal Government and used by a State, or compelled by a State and used by the Federal Government.

[2] The Waterfront Commission of New York Harbor is a bistate body established under an interstate compact approved by Congress. 67 Stat. 541.

ground that the answers might tend to incriminate them under *federal* law, to which the grant of immunity did not purport to extend. Petitioners were thereupon held in civil and criminal contempt of court. The New Jersey Supreme Court reversed the criminal contempt conviction on procedural grounds but, relying on this Court's decisions in *Knapp* v. *Schweitzer,* 357 U. S. 371; *Feldman* v. *United States,* 322 U. S. 487; and *United States* v. *Murdock,* 284 U. S. 141, affirmed the civil contempt judgments on the merits. The court held that a State may constitutionally compel a witness to give testimony which might be used in a federal prosecution against him.[3]  39 N. J. 436, 452–458, 189 A. 2d 36, 46–49.

Since a grant of immunity is valid only if it is coextensive with the scope of the privilege against self-incrimination, *Counselman* v. *Hitchcock,* 142 U. S. 547, we must now decide the fundamental constitutional question of whether, absent an immunity provision, one jurisdiction in our federal structure may compel a witness to give testimony which might incriminate him under the laws of another jurisdiction. The answer to this question must depend, of course, on whether such an application of the privilege promotes or defeats its policies and purposes.

---

[3] At a prior hearing, petitioners had refused to answer the questions, not on the ground of self-incrimination, but on the ground that the Commission had no statutory authority to investigate the work stoppage because it involved a labor dispute over which the National Labor Relations Board had exclusive jurisdiction. This claim was litigated through the state courts and rejected, 35 N. J. 62, 171 A. 2d 295, and this Court denied review, 368 U. S. 32. Petitioners thereupon purged themselves of contempt but again refused to answer the questions, this time on the ground of self-incrimination. In reviewing the contempt judgments which form the bases of this case, the New Jersey Supreme Court correctly held that petitioners did not, at the prior hearing, waive their privilege against self-incrimination. 39 N. J. 436, 449, 189 A. 2d 36, 44.

## I. The Policies of the Privilege.

The privilege against self-incrimination "registers an important advance in the development of our liberty— 'one of the great landmarks in man's struggle to make himself civilized.' " *Ullmann* v. *United States,* 350 U. S. 422, 426.[4] It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," *United States* v. *Grunewald,* 233 F. 2d 556, 581–582 (Frank, J., dissenting), rev'd 353 U. S. 391; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent." *Quinn* v. *United States,* 349 U. S. 155, 162.

Most, if not all, of these policies and purposes are defeated when a witness "can be whipsawed into incriminating himself under both state and federal law even though" the constitutional privilege against self-incrimination is applicable to each. Cf. *Knapp* v. *Schweitzer,* 357 U. S. 371, 385 (dissenting opinion of Mr. Justice Black). This has become especially true in our age of

---

[4] The quotation is from Griswold, The Fifth Amendment Today (1955), 7.

"cooperative federalism," where the Federal and State Governments are waging a united front against many types of criminal activity.[5]

---

[5] It has been argued that permitting a witness in one jurisdiction within our federal structure to invoke the privilege on the ground that he fears prosecution in another jurisdiction:

"is rational only if the policy of the privilege is assumed to be to excuse the witness from the unpleasantness, the indignity, the 'unnatural' conduct of denouncing himself. [But] the policy of the privilege is not this. The policy of the privilege is to regulate a particular government-governed relation—first, to help prevent inhumane treatment of persons from whom information is desired and, second, to satisfy popular sentiment that, when powerful and impersonal government arrays its forces against solitary governed, it would be a violation of the individual's 'sovereignty' and less than fair for the government to be permitted to conscript the knowledge of the governed to its aid. Where the crime is a foreign crime, any motive to inflict brutality upon a person because of the incriminating nature of the disclosure—any 'conviction hunger' as such—is absent. And the sentiments relating to the rules of war between government and governed do not apply where the two are not at war. . . .

"Thus, reasoning from its rationales, the privilege should not apply no matter how incriminating is the disclosure under foreign law and no matter how probable is prosecution by the foreign sovereignty. This is so whether the relevant two sovereignties are different nations, different states, or different sovereignties (such as federal and state) with jurisdiction over the same geographical area." 8 Wigmore, Evidence (McNaughton rev., 1961), 345.

As noted in the text, however, the privilege against self-incrimination represents many fundamental values and aspirations. It is "an expression of the moral striving of the community. . . . a reflection of our common conscience . . . ." *Malloy* v. *Hogan, ante,* p. 9, n. 7, quoting Griswold, The Fifth Amendment Today (1955), 73. That is why it is regarded as so fundamental a part of our constitutional fabric, despite the fact that "the law and the lawyers . . . have never made up their minds just what it is supposed to do or just whom it is intended to protect." Kalven, Invoking the Fifth Amendment—Some Legal and Impractical Considerations, 9 Bull. Atomic Sci. 181, 182. It will not do, therefore, to assign one isolated policy to the privilege, and then to argue that since "the" policy may not be furthered

Respondent contends, however, that we should adhere to the "established rule" that the constitutional privilege against self-incrimination does not protect a witness in one jurisdiction against being compelled to give testimony which could be used to convict him in another jurisdiction. This "rule" has three decisional facets: *United States* v. *Murdock,* 284 U. S. 141, held that the Federal Government could compel a witness to give testimony which might incriminate him under state law; *Knapp* v. *Schweitzer,* 357 U. S. 371, held that a State could compel a witness to give testimony which might incriminate him under federal law; and *Feldman* v. *United States,* 322 U. S. 487, held that testimony thus compelled by a State could be introduced into evidence in the federal courts.

Our decision today in *Malloy* v. *Hogan, supra,* necessitates a reconsideration of this rule.[6] Our review of the pertinent cases in this Court and of their English antecedents reveals that *Murdock* did not adequately consider the relevant authorities and has been significantly weakened by subsequent decisions of this Court, and, further, that the legal premises underlying *Feldman* and *Knapp* have since been rejected.

---

measurably by applying the privilege across state-federal lines, it follows that the privilege should not be so applied.

[6] The constitutional privilege against self-incrimination has two primary interrelated facets: The Government may not use compulsion to elicit self-incriminating statements, see, *e. g., Counselman* v. *Hitchcock,* 142 U. S. 547; and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion. See, *e. g., Haynes* v. *Washington,* 373 U. S. 503. In every "whipsaw" case, either the "compelling" government or the "using" government is a State, and, until today, the States were not deemed fully bound by the privilege against self-incrimination. Now that both governments are fully bound by the privilege, the conceptual difficulty of pinpointing the alleged violation of the privilege on "compulsion" or "use" need no longer concern us.

## II. The Early English and American Cases.

### A. The English Cases Before the Adoption of the Constitution.

In 1749 the Court of Exchequer decided *East India Co.* v. *Campbell,* 1 Ves. sen. 246, 27 Eng. Rep. 1010. The defendant in that case refused to "discover" certain information in a proceeding in an English court on the ground that it might subject him to punishment in the courts of India. The court unanimously held that the privilege against self-incrimination protected a witness in an English court from being compelled to give testimony which could be used to convict him in the courts of another jurisdiction. The court stated the rule to be:

> "that this court shall not oblige one to discover that, which, if he answers in the affirmative, will subject him to the punishment of a crime . . . and that he is punishable appears from the case of *Omichund* v. *Barker,* [1 *Atk.* 21.] as a jurisdiction is erected in *Calcutta* for criminal facts: where he may be sent to government and tried, though not punishable here; like the case of one who was concerned in a rape in *Ireland,* and sent over there by the government to be tried, although the court of *B. R.* here refused to do it . . . for the government may send persons to answer for a crime wherever committed, that he may not involve his country; and to prevent reprisals." 1 Ves. sen., at 247, 27 Eng. Rep., at 1011.

In the following year, this rule was applied in a case involving separate systems of courts and law located within the same geographic area. The defendant in *Brownsword* v. *Edwards,* 2 Ves. sen. 243, 28 Eng. Rep. 157, refused to "discover, whether she was lawfully married" to a certain individual, on the ground that if she admitted to the marriage she would be confessing to an act which, although legal under the common law, would render her

"liable to prosecution in ecclesiastical court." The Lord Chancellor said:

> "This appears a very plain case, in which defendant may protect herself from making a discovery of her marriage; and I am afraid, if the court should over-rule such a plea, it would be setting up the oath *ex officio;* which then the parliament in the time of *Charles* I. would in vain have taken away, if the party might come into this court for it. The general rule is, that no one is bound to answer so as to subject himself to punishment, whether that punishment arises by the ecclesiastical law of the land." 2 Ves. sen., at 244–245, 28 Eng. Rep., at 158.

### B. *The Saline Bank Case.*

It was against this background of English case law that this Court in 1828 decided *United States* v. *Saline Bank of Virginia,* 1 Pet. 100. The Government, seeking to recover certain bank deposits, brought suit in the District Court against the bank and a number of its stockholders. The defendants resisted discovery of "any matters, whereby they may impeach or accuse themselves of any offence or crime, or be liable by the laws of the commonwealth of Virginia, to penalties and grievous fines . . . ." *Id.,* at 102. The unanimous opinion of the Court, delivered by Chief Justice Marshall, reads as follows:

> "This is a bill in equity for a discovery and relief. The defendants set up a plea in bar, alleging that the discovery would subject them to penalties under the statute of Virginia.
>
> "The Court below decided in favour of the validity of the plea, and dismissed the bill.
>
> "It is apparent that in every step of the suit, the facts required to be discovered in support of this suit would expose the parties to danger. The rule

clearly is, that a party is not bound to make any discovery which would expose him to penalties, and this case falls within it.

"The decree of the Court below is therefore affirmed." *Id.,* at 104.

This case squarely holds that the privilege against self-incrimination protects a witness in a federal court from being compelled to give testimony which could be used against him in a state court.

## C. *Subsequent Development of the English Rule.*

In 1851, the English Court of Chancery decided *King of the Two Sicilies* v. *Willcox,* 1 Sim. (N. S.) 301, 61 Eng. Rep. 116, a case which this Court in *United States* v. *Murdock,* 284 U. S. 141, erroneously cited as representing the settled "English rule" that a witness is not protected "against disclosing offenses in violation of the laws of another country." *Id.,* at 149. Defendants in that case resisted discovery of information, which, they asserted, might subject them to prosecution under the laws of Sicily. In denying their claim, the Vice Chancellor said:

"The rule relied on by the Defendants, is one which exists merely by virtue of our own municipal law, and must, I think, have reference, exclusively, to matters penal by that law: to matters as to which, if disclosed, the Judge would be able to say, as matter of law, whether it could or could not entail penal consequences." 1 Sim. (N. S.), at 329, 61 Eng. Rep., at 128.

Two reasons were given in support of this statement: (1) "The impossibility of knowing, as matter of law, to what cases the objection, when resting on the danger of incurring penal consequences in a foreign country, may extend . . . ," *id.,* at 331, 61 Eng. Rep., at 128; and (2) the fact that "in such a case, in order to make the disclosure dangerous to the party who objects, it is essential that he

should first quit the protection of our laws, and wilfully go within the jurisdiction of the laws he has violated," [7] *ibid.,* 61 Eng. Rep., at 128.

Within a few years, the pertinent part of *King of the Two Sicilies* was specifically overruled by the Court of Chancery Appeal in *United States of America* v. *McRae,* L. R., 3 Ch. App. 79 (1867), a case not mentioned by this Court in *United States* v. *Murdock, supra.* In *McRae,* the United States sued in an English court for an accounting and payment of moneys allegedly received by the defendant as agent for the Confederate States during the Civil War. The defendant refused to answer questions on the ground that to do so would subject him to penalties under the laws of the United States. The United States argued that the "protection from answering applies only where a person might expose himself to the peril of a penal proceeding in this country [England], and not to the case where the liability to penalty or forfeiture is incurred by the breach of the laws of

---

[7] In *The Queen* v. *Boyes,* 1 B. & S. 311, decided by the Queen's Bench in 1861, a witness had declined to answer a question on the ground that it might tend to incriminate him, whereupon the *"Solicitor General* then produced a pardon of the witness." *Id.,* at 313. The witness nevertheless refused to answer the question on the ground that he could still be impeached by the Parliament. The court held:

"that the danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things—not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. . . .

Now, in the present case, no one seriously supposes that the witness runs the slightest risk of an impeachment . . . . No instance of such a proceeding in the unhappily too numerous cases of bribery which have engaged the attention of the House of Commons has ever occurred, or, so far as we are aware, has ever been thought of." *Id.,* at 330–331.

a foreign country [the United States]." L. R., 3 Ch. App., at 83–84. The United States relied on *King of the Two Sicilies* v. *Willcox, supra.* The Lord Chancellor sustained the claim of privilege and limited *King of the Two Sicilies* to its facts. He said:

> "I quite agree in the general principles stated by Lord *Cranworth,* and in their application to the particular case before him. . . . [The defendants there] did not furnish the least information what the foreign law was upon the subject, though it was necessary for the Judge to know this with certainty before he could say whether the acts done by the persons who objected to answer had rendered them amenable to punishment by that law or not. . . . [Moreover,] it was doubtful whether the Defendants would ever be within the reach of a prosecution, and their being so depended on their voluntary return to [Sicily]." L. R., 3 Ch. App., at 84–87.

In refusing to follow *King of the Two Sicilies* beyond its particular facts, the court said:

> "But in giving judgment Lord *Cranworth* went beyond the particular case, and expressed his opinion that the rule upon which the Defendants relied to protect them from answering was one which existed merely by virtue of our own municipal law, and which must have reference exclusively to matters penal by that law. It was unnecessary to lay down so broad a proposition to support the judgment which he pronounced . . . . What would have been Lord *Cranworth's* opinion upon [the present] state of circumstances it is impossible for me to conjecture; but it is very different from that which was before his mind in that case, and I cannot feel that there is any judgment of his which ought to influence my decision upon the present occasion." *Id.,* at 85.

The court then concluded that under the circumstances it could not "distinguish the case in principle from one where a witness is protected from answering any question which has a tendency to expose him to forfeiture for a breach of our own municipal law." *Id., at* 87. This decision, not *King of the Two Sicilies,* represents the settled "English rule" regarding self-incrimination under foreign law. See *Heriz* v. *Riera,* 11 Sim. 318, 59 Eng. Rep. 896.

### III. THE RECENT SUPREME COURT CASES.

In 1896, in *Brown* v. *Walker,* 161 U. S. 591, this Court, for the first time, sustained the constitutionality of a federal immunity statute. Appellant in that case argued, *inter alia,* that:

> "while the witness is granted immunity from prosecution by the Federal government, he does not obtain such immunity against prosecution in the state courts." *Id.,* at 606.

The Court construed the applicable statute, however, to prevent prosecutions either in state or federal courts.[8]

---

[8] The Court in *Brown* v. *Walker,* 161 U. S. 591, signified approval of the English rule announced in *The Queen* v. *Boyes, supra,* as follows:

"But even granting that there were still a bare possibility that by his disclosure he might be subjected to the criminal laws of some other sovereignty, that, as Chief Justice Cockburn said in *The Queen* v. *Boyes,* 1 B. & S. 311, in reply to the argument that the witness was not protected by his pardon against an impeachment by the House of Commons, is not a real and probable danger, with reference to the ordinary operations of the law in the ordinary courts, but 'a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct.' Such dangers it was never the object of the provision to obviate." 161 U. S., at 608. See note 7, *supra.*

The lower federal courts were also following the English rule that a refusal to answer questions could legitimately be based on the

64

Shortly thereafter, the Court decided *Jack* v. *Kansas*, 199 U. S. 372, in which the state court had held plaintiff in error in contempt for his refusal to answer certain questions on the ground that they would subject him to possible incrimination under federal law. In rejecting plaintiff's claim, this Court said that the Fifth Amendment "has no application in a proceeding like this," and hence "the sole question in the case" is whether "the denial of his claim of right to refuse to answer the questions was in violation of the Fourteenth

danger of incrimination in another jurisdiction. In the case of *In re Graham*, 10 Fed. Cas. 913 (No. 5,659), for example, the witness refused to answer questions asked by a federal official on the ground that answers to such questions might expose "him to a criminal prosecution under the laws of the state of New York." *Id.*, at 914. Judge Blatchford held that the witness was "privileged from answering the questions." *Ibid.* In the case of *In re Hess*, 134 F. 109, decided in 1905, where a bankrupt refused to answer certain questions on the ground that they might tend to incriminate him under state law, the court said:

"Section 860 of the Revised Statutes only prohibits the use of evidence that may be obtained from the bankrupt's books in prosecutions in the federal courts. There is nothing in this section which extends that immunity to the use of such evidence in the state courts, and there is nothing to prevent the trustee from making use of the bankrupt's books in a criminal prosecution against him instituted in the state courts. Obviously, therefore, if section 7, cl. 9, of the bankrupt act, does not protect him against the use of the evidence which he alleges is contained in his books, of an incriminating nature, in either the state or federal courts, and section 860 of the Revised Statutes extends the immunity only to federal courts, and not to state courts, it is plain that whatever incriminating evidence the books may contain could be used without restriction in the state courts for the purpose of convicting him of any crime for which he might be indicted there, and, in consequence of this danger to him, the plea of his constitutional privilege must prevail." *Id.*, at 112.

Also see, *e. g.*, *In re Koch*, 14 Fed. Cas. 832 (No. 7,916); *In re Feldstein*, 103 F. 269; *In re Henschel*, 7 Am. Bankr. R. 207; *In re Kanter*, 117 F. 356; *In re Hooks Smelting Co.*, 138 F. 954, 146 F. 336.

Amendment to the Constitution . . . ." *Id.,* at 380. The Court stated that it did "not believe that in such case there is any real danger of a Federal prosecution, or that such evidence would be availed of by the Government for such purpose." *Id.,* at 382. Then, without citing any authority, the Court added the following cryptic dictum: "We think the legal immunity is in regard to a prosecution in the same jurisdiction, and when that is fully given it is enough." *Ibid.*

That this dictum related solely to the "legal immunity" under the Due Process Clause of the Fourteenth Amendment is apparent from the fact that it was regarded, five weeks later in *Ballmann* v. *Fagin,* 200 U. S. 186, as wholly inapplicable to cases decided under the Self-Incrimination Clause of the Fifth Amendment.[9] Ballmann had been held in contempt of a federal court for refusing to answer certain questions before a federal grand jury. He claimed that his answers might expose him "to the criminal law of the State in which the grand jury was sitting." *Id.,* at 195. Justice Holmes, writing for a Court which included the author of *Jack* v. *Kansas, supra,* squarely held that "[a]ccording to *United States* v. *Saline Bank,* 1 Peters, 100, he was exonerated from disclosures which would have exposed him to the penalties of the state law. See *Jack* v. *Kansas,* 199 U. S. 372, decided this term." 200 U. S., at 195.

A few months after *Ballmann,* the Court decided *Hale* v. *Henkel,* 201 U. S. 43. Appellant had been held in contempt of a federal court for refusing to answer certain questions and produce certain documents. His refusal was based in part on the argument that the federal immunity statute did not protect him from state prosecution. The Government argued, on the authority of *Brown* v. *Walker, supra,* that the statute did protect him

---

[9] At this time, the privilege against self-incrimination had not yet been held applicable to the States through the Fourteenth Amendment.

from state prosecution. The Government assumed that it was settled that a valid federal immunity statute would have to protect against state prosecution. It never suggested, therefore, that immunity from federal prosecution was all that was required. Appellant similarly assumed, without argument, that the Constitution required immunity from state conviction as a condition of requiring incriminating testimony in a federal court. Thus the critical constitutional issue—whether the Fifth Amendment protects a federal witness from incriminating himself under state law—was not briefed or argued in *Hale* v. *Henkel*. Nor was its resolution necessary to the decision of the case, for the Court could have decided the relevant point on the authority of *Brown* v. *Walker, supra,* which had held that a similar federal immunity statute protected against state prosecution. Nevertheless, the Court went on to say:

> "The question has been fully considered in England, and the conclusion reached by the courts of that country that the only danger to be considered is one arising within the same jurisdiction and under the same sovereignty. *Queen* v. *Boyes,* 1 B. & S. 311; *King of the Two Sicilies* v. *Willcox,* 7 State Trials (N. S.), 1049, 1068; *State* v. *March,* 1 Jones (N. Car.), 526; *State* v. *Thomas,* 98 N. Car. 599.
>
> "The case of *United States* v. *Saline Bank,* 1 Pet. 100, is not in conflict with this. That was a bill for discovery, filed by the United States against the cashier of the Saline Bank, in the District Court of the Virginia District, who pleaded that the emission of certain unlawful bills took place, within the State of Virginia, by the law whereof penalties were inflicted for such emissions. It was held that defendants were not bound to answer and subject themselves to those penalties. It is sufficient to say that the prosecution was under a state law which im-

posed the penalty, and that the Federal court was simply administering the state law, and no question arose as to a prosecution under another jurisdiction." 201 U. S., at 69.

This dictum, subsequently relied on in *United States* v. *Murdock, supra,* was not well founded.

The settled English rule was exactly the opposite of that stated by the Court. The most recent authoritative announcement of the English rule had been that made in 1867 in *United States of America* v. *McRae, supra,* where the Court of Chancery Appeals held that where there is a real danger of prosecution in a foreign country, the case could not be distinguished "in principle from one where a witness is protected from answering any question which has a tendency to expose him to forfeiture for a breach of our own municipal law." *Supra,* at 63. The dictum from *King of the Two Sicilies* cited by the Court in *Hale* v. *Henkel* had been rejected in *McRae.* Moreover, the two factors relied on by the English court in *King of the Two Sicilies* were wholly inapplicable to federal-state problems in this country. The first—"The impossibility of knowing, as matter of law, to what cases the [danger of incrimination] may extend . . . ," *supra,* at 60—has no force in our country where the federal and state courts take judicial notice of each other's law. The second—that "in order to make the disclosure dangerous to the party who objects, it is essential that he should first quit the protection of our laws, and wilfully go within the jurisdiction of the laws he has violated," *supra,* at 60–61—is equally inapplicable in our country where the witness is generally within "the jurisdiction" of the State under whose law he claims danger of incrimination, and where, if he is not, the State may demand his extradition. The second case relied on in *Hale* v. *Henkel, supra—The Queen* v. *Boyes, supra—*was irrelevant to the issue there presented. *The Queen* v. *Boyes* did not involve

different jurisdictions or systems of law. It merely held that the danger of prosecution "must be real and appreciable . . . not a danger of an imaginary and unsubstantial character . . . ." It in no way suggested that the danger of prosecution under foreign law could be ignored if it was "real and appreciable." [10]

Thus, the authorities relied on by the Court in *Hale* v. *Henkel* provided no support for the conclusion that under the Fifth Amendment "the only danger to be considered is one arising within the same jurisdiction and under the same sovereignty." Nor was its attempt to distinguish Chief Justice Marshall's opinion in *United States* v. *Saline Bank of Virginia, supra,* more successful. The Court's reading of *Saline Bank* suggests that the state, rather than the federal, privilege against self-incrimination applies to federal courts when they are administering state substantive law. The most reason-

---

[10] See note 7, *supra.* Nor were the North Carolina cases relied on in *Hale* v. *Henkel* settled authority in favor of the proposition that the Fifth Amendment did not protect a federal witness from incriminating himself under state law. In *State* v. *March,* 1 Jones (N. C.) 526, the North Carolina Supreme Court in 1853 did say that the North Carolina "[c]ourts, in administering justice among their suitors, will not notice the criminal laws of another State or country, so far as to protect a witness from being asked whether he had not violated them." That court, of course, was not applying either the Fifth Amendment or the Fourteenth Amendment (which was not yet enacted), and the North Carolina rule against self-incrimination apparently was narrower in scope than the federal rule. See *State* v. *Thomas,* 98 N. C. 599, 603, 4 S. E. 518, 520 (citing cases). In any event, the authority of the *March* case had been significantly diminished, if not discredited, by the second of the North Carolina cases relied upon in *Hale* v. *Henkel.* In *State* v. *Thomas, supra,* the North Carolina Supreme Court conceded that the *March* "case is not distinguishable in principle from that before us." It continued: "We prefer, however, to put our decision upon other ground—*more satisfactory to our own minds* and well sustained by adjudications in other Courts." 98 N. C., at 604, 4 S. E., at 520–521. (Emphasis added.) The court then held that the witness had waived his privilege against self-incrimination.

able reading of that case, however, and the one which was plainly accepted by Justice Holmes in *Ballmann* v. *Fagin, supra,* is that the privilege against self-incrimination precludes a federal court from requiring an answer to a question which might incriminate the witness under state law.[11] This reading is especially compelling in light of the English antecedents of the *Saline Bank* case. See *East India Co.* v. *Campbell,* discussed, *supra,* at 58; and *Brownsword* v. *Edwards,* discussed, *supra,* at 58–59.

The weakness of the *Hale* v. *Henkel* dictum was immediately recognized both by lower federal courts[12] and by this Court itself. In *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, decided in 1927 by a unanimous

[11] It has been argued that "[i]t is abundantly clear . . . that *Saline Bank* stands for no constitutional principle whatever. It was merely a reassertion of the ancient *equity rule* that a court of equity will not order discovery that may subject a party to criminal prosecution. In fact, the decision was cited in support of that proposition by an esteemed member of the very Court that decided the case. 2 Story, Commentaries on Equity, § 1494, n. 1 (1836)." *Hutcheson* v. *United States,* 369 U. S. 599, 608, n. 13 (opinion of MR. JUSTICE HARLAN).

The cited authority does not, however, support the argument "that *Saline Bank* stands for no constitutional principle whatever." That case was cited by Story, intermingled with more than a dozen other cases, in a footnote to the following statement: "Courts of Equity . . . will not compel a discovery in aid of a criminal prosecution . . . for *it is against the genius of the Common Law to compel a party to accuse himself; and* it is against the general principles of Equity to aid in the enforcement of penalties or forfeitures." (Emphasis added.) This statement suggests that the common-law privilege and the equitable rule are so intermeshed that it serves no useful purpose to attempt to ascertain whether a given application by a Court of Equity rested on the former or the latter.

[12] See, *e. g., United States* v. *Lombardo,* 228 F. 980, aff'd on other grounds, 241 U. S. 73, where the court accepted defendant's contention that if she answered certain questions, she might "incriminate herself under the criminal laws of Washington." See also, *e. g., Buckeye Powder Co.* v. *Hazard Powder Co.,* 205 F. 827; *In re Doyle,* 42 F. 2d 686, rev'd without opinion, 47 F. 2d 1086.

Court, appellant refused to answer certain questions put to him in a deportation proceeding on the ground that they "might have tended to incriminate him under the Illinois Syndicalism Law . . . ." *Id.*, at 112. Instead of deciding the issue on the authority of the *Hale* v. *Henkel* dictum, the Court held that the privilege had been waived. The Court then said:

> "This conclusion makes it unnecessary for us to consider the extent to which the Fifth Amendment guarantees immunity from self-incrimination under state statutes or whether this case is to be controlled by *Hale* v. *Henkel,* 201 U. S. 43; *Brown* v. *Walker,* 161 U. S. 591, 608; compare *United States* v. *Saline Bank,* 1 Pet. 100; *Ballmann* v. *Fagin,* 200 U. S. 186, 195." 273 U. S., at 113.

In a subsequent case, decided in 1933, this Court said that the question—whether "one under examination in a federal tribunal could not refuse to answer on account of probable incrimination under state law"—was "specifically reserved in *Vajtauer* v. *Comm'r of Immigration,*" and was not "definitely settled" until 1931. *United States* v. *Murdock,* 290 U. S. 389, 396.

In 1931, the Court decided *United States* v. *Murdock,* 284 U. S. 141, the case principally relied on by respondent here. Appellee had been indicted for failing to supply certain information to federal revenue agents. He claimed that his refusal had been justified because it rested on the fear of federal and state incrimination. The Government argued that the record supported only a claim of state, not federal, incrimination, and that the Fifth Amendment does not protect against a claim of state incrimination. Appellee did not respond to the latter argument, but instead rested his entire case on the claim that his refusals had in each instance been based on federal as well as state incrimination. In support of

its constitutional argument, the Government cited the same two English cases erroneously relied on in the *Hale v. Henkel* dictum—*King of the Two Sicilies* v. *Willcox, supra,* which had been overruled, and *The Queen* v. *Boyes, supra,* which was wholly inapposite. An examination of the briefs and summary of argument indicates that neither the Government nor the appellee informed the Court that *King of the Two Sicilies* had been overruled by *United States of America* v. *McRae, supra.*[13]

This Court decided that appellee's refusal to answer rested solely on a fear of state prosecution, and then concluded, in one brief paragraph, that such a fear did not justify a refusal to answer questions put by federal officers.

The Court gave three reasons for this conclusion. The first was that:

> "Investigations for federal purposes may not be prevented by matters depending upon state law. Constitution, Art. VI, § 2." 284 U. S., at 149.

This argument, however, begs the critical question. No one would suggest that state law could prevent a proper federal investigation; the Court had already held that the Federal Government could, under the Supremacy Clause, grant immunity from state prosecution, and that, accordingly, state law could not prevent a proper federal investigation. The critical issue was whether the Federal Government, *without granting immunity from state prosecution,* could compel testimony which would incriminate under state law. The Court's first "reason" was not responsive to this issue.

The second reason given by the Court was that:

> "The English rule of evidence against compulsory self-incrimination, on which historically that con-

---

[13] The Government also relied on the North Carolina case of *State v. March, supra,* which, as previously noted, see note 10, *supra,* had been discredited by the subsequent case of *State v. Thomas, supra.*

tained in the Fifth Amendment rests, does not protect witnesses against disclosing offenses in violation of the laws of another country. *King of the Two Sicilies* v. *Willcox,* 7 State Trials (N. S.) 1050, 1068. *Queen* v. *Boyes,* 1 B. & S. 311, 330." 284 U. S., at 149.

As has been demonstrated, the cases cited were in one instance overruled and in the other inapposite, and the English rule was the opposite from that stated in this Court's opinion: The rule did "protect witnesses against disclosing offenses in violation of the laws of another country." *United States of America* v. *McRae, supra.*

The third reason given by the Court in *Murdock* was that:

"This court has held that immunity against state prosecution is not essential to the validity of federal statutes declaring that a witness shall not be excused from giving evidence on the ground that it will incriminate him, and also that the lack of state power to give witnesses protection against federal prosecution does not defeat a state immunity statute. The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination. *Counselman* v. *Hitchcock,* 142 U. S. 547. *Brown* v. *Walker,* 161 U. S. 591, 606. *Jack* v. *Kansas,* 199 U. S. 372, 381. *Hale* v. *Henkel,* 201 U. S. 43, 68." 284 U. S., at 149.

This argument—that the rule in question had already been "established" by the past decisions of the Court—is not accurate. The first case cited by the Court—*Counselman* v. *Hitchcock*—said nothing about the problem of incrimination under the law of another sovereign. The second case—*Brown* v. *Walker*—merely held that the

federal immunity statute there involved did protect against state prosecution. The third case—*Jack* v. *Kansas*—held that the Due Process Clause of the Fourteenth Amendment did not prevent a State from compelling an answer to a question which presented no "real danger of a Federal prosecution." 199 U. S., at 382. The final case—*Hale* v. *Henkel*—contained dictum in support of the rule announced which was without real authority and which had been questioned by a unanimous Court in *Vajtauer* v. *Commissioner of Immigration, supra.* Moreover, the Court subsequently said, in no uncertain terms, that the rule announced in *Murdock* had not been previously "established" by the decisions of the Court. When Murdock appealed his subsequent conviction on the ground, *inter alia,* that an instruction on willfulness should have been given, the Court affirmed the Court of Appeals' reversal of his conviction and said that:

> "Not until this court pronounced judgment in *United States* v. *Murdock,* 284 U. S. 141, had it been definitely settled that one under examination in a federal tribunal could not refuse to answer on account of probable incrimination under state law. The question was involved, but not decided, in *Ballmann* v. *Fagin,* 200 U. S. 186, 195, and specifically reserved in *Vajtauer* v. *Comm'r of Immigration,* 273 U. S. 103, 113." *United States* v. *Murdock,* 290 U. S. 389, 396.

Thus, neither the reasoning nor the authority relied on by the Court in *United States* v. *Murdock,* 284 U. S. 141, supports its conclusion that the Fifth Amendment permits the Federal Government to compel answers to questions which might incriminate under state law.

In 1944 the Court, in *Feldman* v. *United States,* 322 U. S. 487, was confronted with the situation where evidence compelled by a State under a grant of state immunity was "availed of by the [Federal] Government" and

introduced in a federal prosecution. *Jack* v. *Kansas,* 199 U. S., at 382. This was the situation which the Court had earlier said it did "not believe" would occur. *Ibid.* Nevertheless, the Court, in a 4-to-3 decision, upheld this practice, but did so on the authority of a principle which is no longer accepted by this Court. The *Feldman* reasoning was essentially as follows:

> "[T]he Fourth and Fifth Amendments, intertwined as they are, [express] supplementing phases of the same constitutional purpose . . . ." 322 U. S. 489–490.
>
> "[O]ne of the settled principles of our Constitution has been that these Amendments protect only against invasion of civil liberties by the [Federal] Government whose conduct they alone limit." *Id.,* at 490.
>
> "And so, while evidence secured through unreasonable search and seizure by federal officials is inadmissible in a federal prosecution, *Weeks* v. *United States, supra;* . . . incriminating documents so secured by state officials without participation by federal officials but turned over for their use are admissible in a federal prosecution. *Burdeau* v. *McDowell,* 256 U. S. 465." 322 U. S., at 492.

The Court concluded, therefore, by analogy to the then extant search and seizure rule, that evidence compelled by a state grant of immunity could be used by the Federal Government. But the legal foundation upon which that 4-to-3 decision rested no longer stands. Evidence illegally seized by state officials may not now be received in federal courts. In *Elkins* v. *United States,* 364 U. S. 206, the Court held, over the dissent of the writer of the *Feldman* decision, that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's

timely objection in a federal criminal trial." 364 U. S., at 223. Thus, since the fundamental assumption underlying *Feldman* is no longer valid, the constitutional question there decided must now be regarded as an open one.

The relevant cases decided by this Court since *Feldman* fall into two categories. Those involving a federal immunity statute—exemplified by *Adams* v. *Maryland,* 347 U. S. 179—in which the Court suggested that the Fifth Amendment bars use by the States of evidence obtained by the Federal Government under the threat of contempt. And those involving a state immunity statute—exemplified by *Knapp* v. *Schweitzer,* 357 U. S. 371—where the Court, applying a rule today rejected, held the Fifth Amendment inapplicable to the States.[14]

In *Adams* v. *Maryland, supra,* petitioner had testified before a United States Senate Committee investigating crime, and his testimony had later been used to convict him of a state crime. A federal statute at that time provided that no testimony given by a witness in congressional inquiries "shall be used as evidence in any criminal proceeding against him in any court . . . ." 62 Stat. 833. The State questioned the application of the statute to petitioner's testimony and the constitutionality of the statute if construed to apply to state courts. The Court, in an opinion joined by seven members, made the following significant statement: "a witness does not need any statute to protect him from the use of self-incriminating testimony he is compelled to give over his objection. The Fifth Amendment takes care of that without a statute." 347 U. S., at 181.[15] This statement suggests

---

[14] In *Mills* v. *Louisiana,* 360 U. S. 230, the Court, without opinion, simply applied the rule announced in *Knapp* v. *Schweitzer,* 357 U. S. 371. In *Hutcheson* v. *United States,* 369 U. S. 599, there was no opinion of the Court.

[15] The Court in *Adams* v. *Maryland,* 347 U. S. 179, went on to construe the statute as affording more protection than would be provided

that any testimony elicited under threat of contempt by a government to whom the constitutional privilege against self-incrimination is applicable (at the time of that decision it was deemed applicable only to the Federal Government) may not constitutionally be admitted into evidence against him in any criminal trial conducted by a government to whom the privilege is also applicable. This statement, read in light of today's decision in *Malloy* v. *Hogan, ante,* at 1, draws into question the continuing authority of the statements to the contrary in *United States* v. *Murdock,* 284 U. S. 141, and *Feldman* v. *United States, supra.*[16]

*Knapp* v. *Schweitzer,* 357 U. S. 371, involved a state contempt conviction for a witness' refusal to answer questions, under a grant of state immunity, on the ground that his answers might subject him to prosecution under federal law. Petitioner claimed that "the Fifth Amendment gives him the privilege, which he can assert against either a State or the National Government, against giving testimony that might tend to implicate him in a violation" of federal law. *Id.,* at 374. The Court, apply-

---

by the Fifth Amendment alone. It held that the statute applied even where, as there, the witness had not claimed his privilege against self-incrimination before being required to testify. It held, as well, that the statute did, and constitutionally could, prevent use of the testimony in state as well as federal courts.

[16] In *Ullmann* v. *United States,* 350 U. S. 422, decided two years after *Adams,* the Court did not reach the constitutional question of whether a State could prosecute a person on the basis of evidence obtained by the Federal Government under a federal immunity statute. The Court again construed the applicable statute, which related to testimony involving national security, to apply to the States and held that the paramount federal "authority in safeguarding national security" justifies "the restriction it has placed on the exercise of state power . . . ." *Id.,* at 436.

ing the rule then in existence, denied petitioner's claim and declared that:

> "It is plain that the [Fifth Amendment] can no more be thought of as restricting action by the States than as restricting the conduct of private citizens. The sole—although deeply valuable—purpose of the Fifth Amendment privilege against self-incrimination is the security of the individual against the exertion of the power of the Federal Government to compel incriminating testimony with a view to enabling that same Government to convict a man out of his own mouth." *Id.*, at 380.

The Court has today rejected that rule, and with it, all the earlier cases resting on that rule.

The foregoing makes it clear that there is no continuing legal vitality to, or historical justification for, the rule that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction.

## IV. Conclusions.

In light of the history, policies and purposes of the privilege against self-incrimination, we now accept as correct the construction given the privilege by the English courts [17] and by Chief Justice Marshall and Justice Holmes. See *United States* v. *Saline Bank of Virginia, supra; Ballmann* v. *Fagin, supra.* We reject—as unsupported by history or policy—the deviation from that construction only recently adopted by this Court in *United States* v. *Murdock, supra,* and *Feldman* v. *United States, supra.* We hold that the constitutional privilege

---

[17] The English rule apparently prevails also in Canada, Australia and India. See Grant, Federalism and Self-Incrimination: Common Law and British Empire Comparisons, 5 U. C. L. A. L. Rev. 1 (1958).

against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law.

We must now decide what effect this holding has on existing state immunity legislation. In *Counselman* v. *Hitchcock,* 142 U. S. 547, this Court considered a federal statute which provided that no "evidence obtained from a party or witness by means of a judicial proceeding . . . shall be given in evidence, or in any manner used against him . . . in any court of the United States . . . ." *Id.,* at 560. Notwithstanding this statute, appellant, claiming his privilege against self-incrimination, refused to answer certain questions before a federal grand jury. The Court said "that legislation cannot abridge a constitutional privilege, and that it cannot replace or supply one, at least unless it is so broad as to have the same extent in scope and effect." *Id.,* at 585. Applying this principle to the facts of that case, the Court upheld appellant's refusal to answer on the ground that the statute:

"could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding in such court . . . ," *id.,* at 564,

that it:

"could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted . . . ," *ibid.,*

and that it:

"affords no protection against that use of compelled testimony which consists in gaining therefrom a

knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party." *Id.,* at 586.

Applying the holding of that case to our holdings today that the privilege against self-incrimination protects a state witness against federal prosecution, *supra,* at 77–78, and that "the same standards must determine whether [a witness'] silence in either a federal or state proceeding is justified," *Malloy* v. *Hogan, ante,* at 11, we hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits.[18] This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.

It follows that petitioners here may now be compelled to answer the questions propounded to them. At the time they refused to answer, however, petitioners had a reasonable fear, based on this Court's decision in *Feldman* v. *United States, supra,* that the federal authorities might use the answers against them in connection with a federal

---

[18] Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.

prosecution. We have now overruled *Feldman* and held that the Federal Government may make no such use of the answers. Fairness dictates that petitioners should now be afforded an opportunity, in light of this development, to answer the questions. Cf. *Raley* v. *Ohio,* 360 U. S. 423. Accordingly, the judgment of the New Jersey courts ordering petitioners to answer the questions may remain undisturbed. But the judgment of contempt is vacated and the cause remanded to the New Jersey Supreme Court for proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK concurs in the judgment and opinion of the Court for the reasons stated in that opinion and for the reasons stated in *Feldman* v. *United States,* 322 U. S. 487, 494 (dissenting opinion), as well as *Adamson* v. *California,* 332 U. S. 46, 68 (dissenting opinion); *Speiser* v. *Randall,* 357 U. S. 513, 529 (concurring opinion); *Bartkus* v. *Illinois,* 359 U. S. 121, 150 (dissenting opinion); and *Abbate* v. *United States,* 359 U. S. 187, 201 (dissenting opinion).

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, concurring in the judgment.

Unless I wholly misapprehend the Court's opinion, its holding that testimony compelled in a state proceeding over a witness' claim that such testimony will incriminate him may not be used against the witness in a federal criminal prosecution rests on *constitutional* grounds. On that basis, the contrary conclusion of *Feldman* v. *United States,* 322 U. S. 487, is overruled.

I believe that the constitutional holding of *Feldman* was correct, and would not overrule it. To the extent, however, that the decision in that case may have rested

also on a refusal to exercise this Court's "supervisory power" over the administration of justice in federal courts, I think that it can no longer be considered good law, in light of this Court's subsequent decision in *Elkins* v. *United States,* 364 U. S. 206. In *Elkins,* this Court, exercising its supervisory power, did away with the "silver platter" doctrine and prohibited the use of evidence unconstitutionally seized by state authorities in a federal criminal trial involving the person suffering such a seizure. I believe that a similar supervisory rule of exclusion should follow in a case of the kind now before us, and solely on that basis concur in this judgment.

## I.

The Court's constitutional conclusions are thought by it to follow from what it terms the "policies" of the privilege against self-incrimination and a re-examination of various cases in this Court, particularly in the context of early English law. Almost entirely absent from the statement of "policies" is any reference to the particular problem of this case; at best, the statement suggests the set of values which are on one side of the issue. The discussion of precedent is scarcely more helpful. It intertwines decisions of this Court with decisions in English courts, which *perhaps* follow a different rule,[1] and casts

---

[1] The English rule is not clear. In *United States of America* v. *McRae,* L. R., 3 Ch. App. 79 (1867), the case on which the majority primarily relies, the United States came into court as a party and sought to elicit from the defendant answers which would have subjected him to a forfeiture of property under the laws of the United States. Upholding the defendant's refusal to answer, the Lord Chancellor pointed out that the ". . . Plaintiffs calling for an answer are the sovereign power by whose authority and in whose name the proceedings for the forfeiture are instituted, and who have the property to be forfeited within their reach." *Id.,* at 85. That case, in which one sovereign, as a party in a civil proceeding, attempted to use the judicial process of another sovereign to obtain answers which would subject

doubt for one reason or another on every American case which does not accord with the result now reached. When the skein is untangled, however, and the line of cases is spread out, two facts clearly emerge:

(1) With two early and somewhat doubtful exceptions, this Court has consistently rejected the proposition that

the witness to a forfeiture under the laws of the former is clearly distinguishable from the present case.

In *King of the Two Sicilies* v. *Willcox*, 1 Sim. (N. S.) 301, 61 Eng. Rep. 116 (1851), the Vice-Chancellor had said that "the rule of protection [against self-incrimination] is confined to what may tend to subject a party to penalties *by our own laws* . . . ." 1 Sim. (N. S.), at 331, 61 Eng. Rep., at 128 (emphasis added). The Lord Chancellor said in *McRae, supra*, that *King of the Two Sicilies* had been "most correctly decided," L. R., 3 Ch. App., at 85, but that the general rule there laid down was unnecessarily broad. He declined to apply the rule in *McRae* on the ground that "the· presumed ignorance of the Judge as to foreign law . . . [had been] completely removed by the admitted statements upon the pleadings, in which the exact nature of the penalty or forfeiture incurred by the party objecting to answer is precisely stated . . . ," L. R., 3 Ch. App., at 85, and the further ground, noted above, that the property subject to a forfeiture was "within the power of the *United States*," *id.*, at 87.

The other two English cases which the majority cites in this connection were decided more than 100 years earlier than *King of the Two Sicilies*. Moreover, both cases involved disclosures which would have been incriminating under a separate system of laws operating within the same legislative sovereignty. *East India Co.* v. *Campbell*, 1 Ves. sen. 246, 27 Eng. Rep. 1010 (Ex. 1749); *Brownsword* v. *Edwards*, 2 Ves. sen. 243, 28 Eng. Rep. 157 (Ch. 1750). In *King of the Two Sicilies*, which involved the laws of another sovereign, the Vice-Chancellor observed that there was an "absence of all authority on the point" raised before him. 1 Sim. (N. S.), at 331, 61 Eng. Rep., at 128.

There is little agreement among the authorities on the effect of these cases. See Grant, Federalism and Self Incrimination: Common Law and British Empire Comparisons, 5 U. C. L. A. L. Rev. 1–8; 8 Wigmore, Evidence (3d ed. 1940), § 2258, n. 3; Kroner, Self Incrimination: The External Reach of the Privilege, 60 Col. L. Rev. 816, 820, n. 26; McNaughton, Self-Incrimination Under Foreign Law, 45 Va. L. Rev. 1299, 1302.

the danger of incrimination in the court of another juris-
diction is a sufficient basis for invoking a privilege against
self-incrimination;

(2) Without any exception, in every case involving an
immunity statute in which the Court has treated the
question now before us, it has rejected the present major-
ity's views.

The first of the two exceptional cases is *United States
v. Saline Bank of Virginia,* 1 Pet. 100, decided in 1828;
the entire opinion in that case is quoted in the majority
opinion, *ante,* pp. 59–60. It is not clear whether that case
has any bearing on the privilege against self-incrimina-
tion at all.[2]  The second case is *Ballmann* v. *Fagin,* 200
U. S. 186, decided in 1906. The statement that the ap-
pellant "was exonerated from disclosures which would
have exposed him to the penalties of the state law," *id.,*
at 195, was at best an *alternative* holding and probably
not even that.[3]  Ballmann had based his refusal to testify
before the Grand Jury solely on the possibility of incrim-
ination under state law, *id.,* at 193–194. Nevertheless,
before considering the effect of state incrimination at all,
the Court pointed out that the facts showed a likelihood

---

[2] Compare McNaughton, *supra,* note 1, at 1305–1306, with Kroner,
*supra,* note 1, at 818. See *Hutcheson* v. *United States,* 369 U. S.
599, 608, n. 13; *Feldman* v. *United States, supra,* at 494.

That this case has meant different things to different people is
evidenced by the opinion in *Hale* v. *Henkel,* 201 U. S. 43, in which
the Court distinguished *Saline Bank,* presumably inadequately, on
the ground that in it "the Federal court was simply administering
the state law, and no question arose as to a prosecution under another
jurisdiction." 201 U. S., at 69.

[3] In *United States* v. *Murdock,* 290 U. S. 389, 396, the Court said
that the question whether "one under examination in a federal tri-
bunal could . . . refuse to answer on account of probable incrimina-
tion under state law" had been "involved, but not decided" in
*Ballmann.*

of incrimination under *federal* law. *Id.,* at 195. The Court then proceeded to say:

"Not impossibly Ballmann took this aspect of the matter for granted, as one which would be perceived by the court without his disagreeably emphasizing his own fears. But he did call attention to another less likely to be known. As we have said, he set forth that there were many proceedings on foot against him as party to a 'bucket shop,' and so subject to the criminal law of the State in which the grand jury was sitting. According to *United States* v. *Saline Bank,* 1 Peters, 100, he was exonerated from disclosures which would have exposed him to the penalties of the state law. See *Jack* v. *Kansas,* 199 U. S. 372, decided this term. One way or the other we are of opinion that Ballmann could not be required to produce his cash book if he set up that it would tend to criminate him." *Id.,* at 195–196.

Since the *Jack* case which the Court cited immediately after referring to *Saline Bank* had been decided just a few weeks before *Ballmann* and was contrary to *Saline Bank,* it is plain that the Court was *not* approving and applying the latter case. The explanation for the Court's inclusion of this ambiguous and inconclusive discussion of state incrimination is surely the fact that Ballmann had failed to set up the claim of federal incrimination on which the Court relied.

Neither of these two cases, therefore, "squarely holds," *ante,* p. 60; see *ante,* p. 65, that a danger of incrimination under state law relieves a witness from testifying before federal authorities. More to the point, whatever force these two cases provide for the majority's position is wholly vitiated by subsequent cases, which are flatly contradictory to that position.

In *Jack* v. *Kansas,* 199 ·U. S. 372, decided in 1905, the Court considered a Kansas immunity statute. The witness had refused to testify on the ground that his testimony might incriminate him under federal law. The Court upheld his commitment for contempt over his claim that the immunity granted by the state statute was not "broad enough," *id.,* at 380, and that his imprisonment therefore violated the Fourteenth Amendment. The Court said:

> "We think the legal immunity is in regard to a prosecution in the same jurisdiction, and when that is fully given it is enough." *Id.,* at 382.

The present majority characterizes this statement as "cryptic dictum," *ante,* p. 65. But, I submit, there is nothing cryptic about it. Nor is it dictum. The Court assumed for purposes of that case that the Fourteenth Amendment required that a state statute "give sufficient immunity from prosecution or punishment," *id.,* at 380, and it is evident from the opinion that the Court regarded the remoteness of a danger of prosecution in the courts of another jurisdiction, including the federal courts, as a basis for holding *generally,* and not merely on the facts of the case before it, that a state immunity statute need not protect against such danger. See *id.,* at 381–382.

The next case is *Hale* v. *Henkel,* 201 U. S. 43, decided one year later, shortly after *Ballmann.* The Court there rejected the appellant's argument that the federal immunity statute to be valid had to confer immunity from punishment under state law. It said:

> "The further suggestion that the statute offers no immunity from prosecution in the state courts was also fully considered in *Brown* v. *Walker* and held to be no answer. The converse of this was also decided in *Jack* v. *Kansas,* 199 U. S. 372, namely, that the fact

that an immunity granted to a witness under a state statute would not prevent a prosecution of such witness for a violation of a Federal statute, did not invalidate such statute under the Fourteenth Amendment. It was held both by this court and by the Supreme Court of Kansas that the possibility that information given by the witness might be used under the Federal act did not operate as a reason for permitting the witness to refuse to answer, and that a danger so unsubstantial and remote did not impair the legal immunity. Indeed, if the argument were a sound one it might be carried still further and held to apply not only to state prosecutions within the same jurisdiction, but to prosecutions under the criminal laws of other States to which the witness might have subjected himself. The question has been fully considered in England, and the conclusion reached by the courts of that country that the only danger to be considered is one arising within the same jurisdiction and under the same sovereignty. . . ." 201 U. S., at 68–69.[4]

In *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, which did not involve an immunity statute, the Court

---

[4] In *Brown* v. *Walker,* 161 U. S. 591, on which the Court relied in *Hale,* the Court intimated that a federal immunity statute need not protect a witness from "a bare possibility that by his disclosure he might be subjected to the criminal laws of some other sovereignty." 161 U. S., at 608.

In *Jack, supra,* the Court described *Brown* as follows:

"In the subsequent case of *Brown* v. *Walker,* 161 U. S. 591, the statute there involved was held to afford complete immunity to the witness, and he was therefore obliged to answer the questions that were put to him, although they might tend to incriminate him. In that case it was contended, on the part of the witness, that the statute did not grant him immunity against prosecutions in the state courts, although it granted him full immunity from prosecution by the Federal Government. This contention was held to be without merit. While it

found it unnecessary to consider the question, extensively argued by the parties, whether "the Fifth Amendment guarantees immunity from self-incrimination under state statutes . . . ," *id.,* at 113; the Court indicated that it did not necessarily regard *Hale* and *Brown, supra,* as conclusive of that question, *ibid.* Cf. *United States* v. *Murdock,* 290 U. S. 389, 396. Any doubts on this score, however, were settled in 1931, in *United States* v. *Murdock,* 284 U. S. 141. The Court there held unmistakably that an individual could not avoid testifying in federal proceedings on the ground that his testimony might incriminate him under state law.

"This court has held that immunity against state prosecution is not essential to the validity of federal statutes declaring that a witness shall not be excused from giving evidence on the ground that it will incriminate him, and also that the lack of state power to give witnesses protection against federal prosecution does not defeat a state immunity statute.

was asserted that the law of Congress was supreme, and that judges and courts in every State were bound thereby, and that therefore the statute granting immunity would *probably* operate in the state as well as in the Federal courts, yet still, and *aside from that view,* it was said that while there might be a bare possibility that a witness might be subjected to the criminal laws of some other sovereignty, it was not a real and probable danger, but was so improbable that it needed not to be taken into account." 199 U. S., at 381. (Emphasis added.)

*Brown* is cited for the proposition that "full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination," in *United States* v. *Murdock,* 284 U. S. 141, 149. And see *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 113.

The majority is incorrect when it states, *ante,* p. 67, that the Court in *Hale,* relying on *King of the Two Sicilies, supra,* disregarded a "settled English rule" contrary to its own conclusion. See note 1, *supra.*

The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination." *Id.,* at 149.

The Court has not until now deviated from that definitive ruling. In later proceedings in the *Murdock* case, the Court said it was "definitely settled that one under examination in a federal tribunal could not refuse to answer on account of probable incrimination under state law." 290 U. S. 389, 396. The Court adhered to this view in *Feldman, supra,* where it established an equivalent rule allowing the use in a federal court of testimony given in a state court. The general principle was said to be one of "separateness in the operation of state and federal criminal laws and state and federal immunity provisions." 322 U. S., at 493–494.[5]

In *Adams* v. *Maryland,* 347 U. S. 179, the Court held that a federal immunity statute,[6] the language of which "could be no plainer," *id.,* at 181, prohibited the use in a state criminal trial of testimony given before a Senate Committee. Quite obviously, the remark in *Adams* that the Fifth Amendment protects a witness "from the use of self-incriminating testimony he is compelled to give over his objection," *ibid.,* does not even remotely suggest "that any testimony elicited under threat of contempt by

---

[5] This was the principle underlying the decision in *Feldman* rather than the so-called *"Feldman* reasoning," *ante,* p. 74, which, as described by the majority, consists of phrases plucked from separate paragraphs appearing on four different pages of the reported opinion, see *Feldman, supra,* at 489–492. The Court referred to the "silver platter" doctrine only to illustrate a related principle then applicable in the area of search-and-seizure. See *id.,* at 492.

The majority is, however, correct in stating that the decision in *Elkins* v. *United States,* 364 U. S. 206, discarding the "silver platter" doctrine has an important bearing on this case. See *infra,* p. 91.

[6] See *Adams, supra,* at 180, note 1.

a government to whom the constitutional privilege against self-incrimination is applicable . . . may not constitutionally be admitted into evidence against him in any criminal trial conducted by a government to whom the privilege is also applicable," *ante,* p. 76.

In *Knapp* v. *Schweitzer,* 357 U. S. 371, the Court again upheld the validity of state immunity statutes against the charge that they did not, as they could not, confer immunity from federal prosecution. The Court adhered to its position in *Knapp, supra,* in 1959, in *Mills* v. *Louisiana,* 360 U. S. 230.

This, then, is the "history" mustered by the Court in support of overruling the sound constitutional doctrine lying at the core of *Feldman.*

## II.

Part I of this opinion shows, I believe, that the Court's analysis of prior cases hardly furnishes an adequate basis for a new departure in constitutional law. Even if the Court's analysis were sound, however, it would not support reversal of the *Feldman* rule on *constitutional* grounds.

If the Court were correct in asserting that the "separate sovereignty" theory of self-incrimination should be discarded, that would, as the Court says, lead to the conclusion that "a state witness [is protected] against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law." *Ante,* p. 78. However, dealing strictly with the situation presented by this case, that conclusion does *not* in turn lead to a constitutional rule that the testimony of a state witness (or evidence to which his testimony leads) who is compelled to testify in state proceedings may not be used against him in a federal prosecution. Protection which the Due Process Clause affords against the *States* is quite obviously not any basis for a constitu-

tional rule regulating the conduct of *federal* authorities in *federal* proceedings.

The Court avoids this problem by mixing together the Fifth Amendment and the Fourteenth and talking about "the constitutional privilege against self-incrimination," *ante,* pp. 77–78. Such an approach, which deals with "constitutional" rights at large, unrelated either to particular provisions of the Constitution or to relevant differences between the States and the Federal Government warns of the dangers for our federalism to which the "incorporation" theory of the Fourteenth Amendment leads. See my dissenting opinion in *Malloy* v. *Hogan, ante,* p. 14.

The Court's reasons for overruling *Feldman* thus rest on an entirely new conception of the *Fifth Amendment,* namely that it applies to federal use of state-compelled incriminating testimony. The opinion, however, contains nothing at all to contradict the traditional, well-understood conception of the Fifth Amendment, to which, therefore, I continue to adhere:

> "The sole—although deeply valuable—purpose of the Fifth Amendment privilege against self-incrimination is the security of the individual against the exertion of the power of the Federal Government to compel incriminating testimony with a view to enabling that same Government to convict a man out of his own mouth." *Knapp* v. *Schweitzer, supra,* at 380.

It is no service to our constitutional liberties to encumber the particular provisions which safeguard them with a gloss for which neither the text nor history provides any support.

Accordingly, I cannot accept the majority's conclusion that a rule prohibiting federal authorities from using in aid of a federal prosecution incriminating testimony compelled in state proceedings is constitutionally required.

## III.

I would, however, adopt such a rule in the exercise of our supervisory power over the administration of federal criminal justice. See *McNabb* v. *United States,* 318 U. S. 332, 340–341. The rule seems to me to follow from the Court's rejection, in the exercise of its supervisory power, of the "silver platter" doctrine as applied to the use in federal courts of evidence unconstitutionally seized by state officers. *Elkins* v. *United States,* 364 U. S. 206.

Since I reject the majority's argument that the "separate sovereignty" theory of self-incrimination is historically unfounded, I do not base my conclusion on the holding in *Malloy, ante,* that due process prohibits a State from compelling a witness to testify. My conclusion is based rather on the ground that such a rule is protective of the values which the federal privilege against self-incrimination expresses, without in any way interfering with the independent action of the States and the Federal Government in their respective spheres. Increasing interaction between the State and Federal Governments speaks strongly against permitting federal officials to make prosecutorial use of testimony which a State has compelled when that same testimony could not constitutionally have been compelled by the Federal Government and then used against the witness. Prohibiting such use in no way limits federal power to investigate and prosecute for federal crime, which power will be as full after a State has completed an investigation as before.[7] This adjustment between state investigations of local crime

_____

[7] Speculation that federal agents may first have "gotten wind" of a federal crime by a witness' testimony in state proceedings would not be a basis for barring federal *prosecution,* unaided by the state testimony. As I understand the rule announced today, albeit resting on premises which I think are unsound, it is a prohibition against *the use of state-compelled incriminating evidence or the "fruits" directly attributable thereto* in a federal prosecution.

and federal prosecutions for federal crime seems particularly desirable in view of the increasing, productive cooperation between federal and state authorities in the prevention of crime. By insulating intergovernmental cooperation from the danger of any encroachment on the federal privilege against self-incrimination, such a rule in the long run will probably make joint programs for crime prevention more effective.[8]

On this basis, I concur in the judgment of the Court.

MR. JUSTICE WHITE, with whom MR. JUSTICE STEWART joins, concurring.

The Court holds that the constitutional privilege against self-incrimination is nullified "when a witness 'can be whipsawed into incriminating himself under both state and federal law even though' the constitutional privilege against self-incrimination is applicable to each." *Ante,* p. 55. Whether viewed as an exercise of this Court's supervisory power over the conduct of federal law enforcement officials or a constitutional rule necessary for meaningful enforcement of the privilege, this holding requires that compelled incriminating testimony given in a state proceeding not be used in any manner by federal officials in connection with a federal criminal prosecution. Since these petitioners declined to answer in the belief that their very testimony as well as evidence derived from it could be used by federal authorities in a criminal prosecution against them, they should be afforded an opportunity to purge themselves of the civil contempt convictions by answering the questions. Cf. *Raley* v. *Ohio,* 360 U. S. 423.

In reaching its result the Court does not accept the far-reaching and in my view wholly unnecessary constitu-

---

[8] The question whether *federally* compelled incriminating testimony could be used in a state prosecution is not involved in this case and would, of course, present wholly different considerations.

tional principle that the privilege requires not only complete protection against any use of compelled testimony in any manner in other jurisdictions but also absolute immunity in these jurisdictions from any prosecution pertaining to any of the testimony given. The rule which the Court does not adopt finds only illusory support in a dictum of this Court and, as I shall show, affords no more protection against compelled incrimination than does the rule forbidding federal officials access to statements made in exchange for a grant of state immunity. But such a rule would invalidate the immunity statutes of the 50 States since the States are without authority to confer immunity from federal prosecutions, and would thereby cut deeply and significantly into traditional and important areas of state authority and responsibility in our federal system. It would not only require widespread federal immunization from prosecution in federal investigatory proceedings of persons who violate state criminal laws, regardless of the wishes or needs of local law enforcement officials, but would also deny the States the power to obtain information necessary for state law enforcement and state legislation. That rule, read in conjunction with the holding in *Malloy* v. *Hogan, ante,* p. 1, that an assertion of the privilege is all but conclusive, would mean that testimony in state investigatory proceedings, and in trials also, is on a voluntary basis only. The Federal Government would become the only law enforcement agency with effective power to compel testimony in exchange for immunity from prosecution under federal and state law. These considerations warrant some elaboration.

## I.

Among the necessary and most important of the powers of the States as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to

testify in court or before grand juries or agencies. See *Blair* v. *United States*, 250 U. S. 273.[1] Such testimony constitutes one of the Government's primary sources of information. The privilege against self-incrimination, safeguarding a complex of significant values, represents a broad exception to governmental power to compel the testimony of the citizenry. The privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory, *McCarthy* v. *Arndstein*, 266 U. S. 34, 40; *United States* v. *Saline Bank*, 1 Pet. 100, and it protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used. *Mason* v. *United States*, 244 U. S. 362; *Hoffman* v. *United States*, 341 U. S. 479. Because of the importance of testimony, especially in the discovery of certain crimes for which evidence would not otherwise be available, and the breadth of the privilege, Congress has enacted over 40 immunity statutes and every State, without exception, has one or more immunity acts pertaining to certain offenses or legislative investigations.[2] Such statutes have for more than a century been resorted to for the investigation of many offenses, chiefly those whose proof and punishment were otherwise impracticable, such as political bribery, ex-

---

[1] The power and corresponding duty are recognized in the Sixth Amendment's commands that defendants be confronted with witnesses and that they have the right to subpoena witnesses on their own behalf. The duty was recognized by the first Congress in the Judiciary Act of 1789, which made provision for the compulsion of attendance of witnesses in the federal courts. 1 Stat. 73, 88 (1789). See also Lilienthal, The Power of Governmental Agencies to Compel Testimony, 39 Harv. L. Rev. 694–695 (1926); 8 Wigmore, Evidence, §§ 2190–2193 (McNaughton rev., 1961).

[2] For a listing of Federal Witness Immunity Acts see Comment, 72 Yale L. J. 1568, 1611–1612; the state acts may be found in 8 Wigmore, Evidence, § 2281, n. 11 (McNaughton rev., 1961).

tortion, gambling, consumer frauds, liquor violations, commercial larceny, and various forms of racketeering. This Court, in dealing with federal immunity acts, has on numerous occasions characterized such statutes as absolutely essential to the enforcement of various federal regulatory acts. In *Brown* v. *Walker*, 161 U. S. 591, the case in which the Court first upheld a congressional immunity act over objection that the witness' right to remain silent was inviolate, the Court said: "[If] witnesses standing in Brown's position were at liberty to set up an immunity from testifying, the enforcement of the Interstate Commerce law or other analogous acts, wherein it is for the interest of both parties to conceal their misdoings, would become impossible." 161 U. S. 591, at 610. Again in *Hale* v. *Henkel*, 201 U. S. 43, the Court noted the highly significant role played by immunity acts in the enforcement of federal legislation:

> "As the combination or conspiracies provided against by the Sherman Anti Trust Act can ordinarily be proved only by the testimony of parties thereto, in the person of their agents or employés, the privilege claimed would practically nullify the whole act of Congress. Of what use would it be for the legislature to declare these combinations unlawful if the judicial power may close the door of access to every available source of information upon the subject?" *Id.*, at 70.

And only recently the Court declared that immunity statutes have "become part of our constitutional fabric . . . included '. . . in virtually all of the major regulatory enactments of the Federal Government,' " and "the States . . . have passed numerous statutes compelling testimony in exchange for immunity in the form either of complete amnesty or of prohibition of the use of the compelled testimony." *Ullmann* v. *United States*, 350 U. S. 422, 438.

These state statutes play at least an equally important role in compelling testimony necessary for enforcement of state criminal laws. After all, the States still bear primary responsibility in this country for the administration of the criminal law; most crimes, particularly those for which immunity acts have proved most useful and necessary, are matters of local concern; federal preemption of areas of crime control traditionally reserved to the States has been relatively unknown and. this area has been said to be at the core of the continuing viability of the States in our federal system. See *Abbate* v. *United States,* 359 U. S. 187, 195; *Screws* v. *United States,* 325 U. S. 91, 109; *United States* v. *Cruikshank,* 92 U. S. 542, 553–554; *United States* v. *Ah Hung,* 243 F. 762 (D. C. E. D. N. Y.). Cf. 18 U. S. C. § 5001, 18 U. S. C. § 659.[3]

---

[3] See also *Rutkin* v. *United States,* 343 U. S. 130, 139–147 (BLACK, J., dissenting).

The Senate Crime Committee stated in its third interim report: "Any program for controlling organized crime must take into account the fundamental nature of our governmental system. The enforcement of the criminal law is primarily a State and local responsibility." S. Rep. No. 307, 82d Cong., 1st Sess., 5 (1951).

Attorney General Mitchell commented:

"Experience has shown that when Congress enacts criminal legislation of this type [dealing with local crime] the tendency is for the State authorities to cease their efforts toward punishing the offenders and to leave it to the Federal authorities and the Federal Courts. That has been the experience under the Dyer Act." 72 Cong. Rec. 6214 (1930).

National enactments which touch upon these areas are not designed directly to suppress activities illegal under state law but to assist state enforcement agencies in the administration of their own statutes. See Int. Rev. Code of 1954, §§ 4701–4707, 4711–4716 (narcotics tax); Int. Rev. Code of 1954, §§ 4401–4404, 4411–4413, 4421–4423 (wagering tax). See generally, Schwartz, Federal Criminal Jurisdiction and Prosecutors' Discretion, 13 Law and Contemp. Prob. 64, 83–86 (1948); Comment, 72 Yale L. J. 108, 140–142.

Whenever access to important testimony is barred by possible state prosecution, the State can, at its option, remove the impediment by a grant of immunity; but if the witness is faced with prosecution by the Federal Government, the State is wholly powerless to extend immunity from prosecution under federal law in order to compel the testimony. Almost invariably answers incriminating under state law can be claimed to be incriminating under federal law. Given the extensive sweep of a host of federal statutes, such as the income tax laws, securities regulation, laws regulating use of the mails and other communication media for an illegal purpose, and regulating fraudulent trade practices, and given the very limited discretion, if any, in the trial judge to scrutinize the witness' claim of privilege, *Malloy* v. *Hogan, supra,* investigations conducted by the State into matters· of corruption and misconduct will obviously be thwarted if immunity from prosecution under federal law was a constitutionally required condition to testimonial compulsion in state proceedings. Wherever the witness, for reasons known only to him, wished not to respond to orderly inquiry, the flow of information to the State would be wholly impeded. Every witness would be free to block vitally important state proceedings.

It is not without significance that there were two ostensibly inconsistent lines of cases in this Court regarding the external reach of the privileges in respect to the laws of another jurisdiction. In the cases involving refusals to answer questions in a federal grand jury or discovery proceedings on the ground of incrimination under state law, absent any immunity statute, the Court suggested that the Fifth Amendment privilege protected such answers, *United States* v. *Saline Bank,* 1 Pet. 100; *Ballmann* v. *Fagin,* 200 U. S. 186, while in the cases involving refusals to answer after immunity was conferred, the Court indicated that immunity in regard to a prosecution

in the jurisdiction conducting the inquiry satisfied the privilege. *Brown* v. *Walker,* 161 U. S. 591; *Jack* v. *Kansas,* 199 U. S. 372; *Hale* v. *Henkel,* 201 U. S. 43. Cf. *United States* v. *Murdock,* 284 U. S. 141. The decision in *Ballmann* that a witness in a federal grand jury proceeding could not be compelled to make disclosures incriminating under very similar federal and state criminal statutes was announced by members of the same Court and within a very short time of the decisions in *Jack* and *Hale,* holding that immunity under the laws of one sovereign was sufficient. The basis for these latter holdings, as well as *Knapp* v. *Schweitzer,* 357 U. S. 371, upholding a state contempt conviction for a refusal to answer after a grant of state immunity, was not a niggardly view of the privilege against self-incrimination but "the historic distribution of power as between Nation and States in our federal system." 357 U. S. 371, at 375. As the concurring and dissenting members of the Court in *Knapp* pointed out, the dilemma posed to our federal system by federally incriminating testimony compelled in a state proceeding was not really necessary but for the prior decision in *Feldman* v. *United States,* 322 U. S. 487, which upheld the Federal Government's use of incriminatory testimony compelled in a state proceeding. Although *Feldman* was questioned, no one suggested in *Knapp* that the solution to the problem lay in forbidding the State to ask questions incriminating under federal law.

To answer that the underlying policy of the privilege subordinates the law enforcement function to the privilege of an individual will not do. For where there is only one government involved, be it state or federal, not only is the danger of prosecution more imminent and indeed the likely purpose of the investigation to facilitate prosecution and conviction, but that authority has the choice of exchanging immunity for the needed testimony. To transform possible federal prosecution into a source of

absolute protected silence on the part of a state witness would leave no such choice to the States. Only the Federal Government would retain such an option.

Nor will it do to say that the Congress could reinstate state power by authorizing state officials to confer absolute immunity from federal prosecutions. Congress has established highly complicated procedures, requiring the approval of the Attorney General, before a limited group of federal officials may grant immunity from federal prosecutions. *E. g.*, 18 U. S. C. § 3486,[4] 18 U. S. C. § 1406. The decision to grant immunity is based upon the importance of the testimony to federal law enforcement interest, a matter within the competence of federal officials to assay. These procedures would create insurmountable obstacles if the requests for approval were to come from innumerable local officials of the 50 States. Obviously federal officials could not properly evaluate the extent of the State's need for the testimony on a case-by-case basis. Further, the scope of the immunity conferred wholly depends on the testimony given, a matter of con-

---

[4] The debates on the bill leading to the statute which granted a congressional committee the power to confer immunity well reveal the concern over immunization from federal prosecution without the express approval of the Attorney General in each case. 99 Cong. Rec. 4737–4740, 8342–8343; H. R. Rep. No. 2606, 83d Cong., 2d Sess. (1954). See Brownell, Immunity From Prosecution Versus Privilege Against Self-Incrimination, 28 Tul. L. Rev. 1 (1953):

"[I]f any measure is to be enacted permitting the granting of immunity to witnesses before either House of Congress, or its committees, it should vest the Attorney General, or the Attorney General acting with the concurrence of appropriate members of Congress, with the authority to grant such immunity, and if the testimony is sought for a court or grand jury that the Attorney General alone be authorized to grant the immunity." (Remarks of Attorney General Brownell.) *Id.*, at 19.

Congress adopted this view in recent immunity statutes. 18 U. S. C. § 3486; 18 U. S. C. § 1406. See also Comment, 72 Yale L. J. 1568, 1598–1610 (1963).

siderable difficulty to determine after, no less than before, the question is answered, the time when federal approval would be necessary, *Heike* v. *United States,* 227 U. S. 131; *Lumber Products Assn.* v. *United States,* 144 F. 2d 546 (C. A. 9th Cir.), and a matter whose determination requires intimate familiarity with both the nature and details of the investigation and the background of the witness. Finally, it is very doubtful that Congress would, if it had the power to, authorize one State to confer immunity on persons subject to prosecution under the criminal laws of another State.

## II.

Neither the conflict between state and federal interests nor the consequent enthronement of federal agencies as the only law enforcement authorities with effective power to compel testimony is necessary to give full effect to a privilege against self-incrimination whose external reach embraces federal as well as state law. The approach need not and, in light of the above considerations, should not be in terms of the State's power to compel the testimony rather than the use to which such testimony can be put. It is unquestioned that an immunity statute, to be valid, must be coextensive with the privilege which it displaces, but it need not be broader. *Counselman* v. *Hitchcock,* 142 U. S. 547; *Brown* v. *Walker,* 161 U. S. 591; *Hale* v. *Henkel,* 201 U. S. 43. If the compelled incriminating testimony in a state proceeding cannot be put to any use whatsoever by federal officials, quite obviously the witness' privilege against self-incrimination is not infringed. For the privilege does not convey an absolute right to remain silent. It protects a witness from being compelled to furnish evidence that could result in his being subjected to a criminal sanction, *Hoffman* v. *United States,* 341 U. S. 479; *Mason* v. *United States,* 244 U. S. 362, if, but only if, after the disclosure the witness will be in greater danger of prosecution and conviction.

*Rogers* v. *United States,* 340 U. S. 367; *United States* v. *Gernie,* 252 F. 2d 664 (C. A. 2d Cir.). When federal officials are barred not only from introducing the testimony into evidence in a federal prosecution but also from introducing any evidence derived from such testimony, the disclosure has in no way contributed to the danger or likelihood of a federal prosecution. This approach secures the protections of the privilege against self-incrimination for all defendants without impairing local law-enforcement and investigatory activities. It, of course, forecloses the use of state-compelled testimony in any manner by federal prosecutors, but the privilege in my view commands that the Federal Government should not have the benefit of compelled incriminatory testimony. Both the Federal Government and the witness are in exactly the same position as if the witness had remained silent.[5] And state immunity statutes remain constitutional and state law enforcement agencies viable.

It is argued that a rule only forbidding use of compelled testimony does not afford absolute protection against the possibility of a federal prosecution based in part on the compelled testimony. It is said that absent any deliberate attempt by federal officers to utilize the testimony the very identification and testimony of the witness in the state proceedings, perhaps in the newspapers, may

---

[5] *Feldman* v. *United States,* 322 U. S. 487, allowed the use of testimony compelled in exchange for a grant of state immunity to secure a conviction for a federal offense. I think the Court in *Feldman* erred in its assumption that an effective exclusionary rule would allow the States to determine on the basis of local policy which offenders should be immune from federal prosecution. The Federal Government can prosecute and convict persons who have received immunity for testimony in a state investigation. But it must do so without the assistance of the compelled incriminatory testimony.

That case also relied on the doctrine since repudiated in *Elkins* v. *United States,* 364 U. S. 206, that evidence illegally seized by state officials is admissible in federal courts.

increase the possibility of a federal prosecution and alternatively that the defendant may not be able to prove that evidence was intentionally and unlawfully derived from his compelled testimony. These are fanciful considerations, hardly sufficient as a basis for a constitutional adjudication working a substantial reallocation of power between state and national governments.

In the absence of any misconduct or collusion by federal officers, whatever increase there is, if any, in the likelihood of federal prosecution following the witness' appearance before a state grand jury or agency results from the inferences drawn from the invocation of the privilege to specific questions on the ground that they are incriminating under federal law and not from the fact the witness has testified in what is frequently an *in camera* proceeding under a grant of immunity. Whether *in camera* or not, the testimony itself is hardly reported in newspapers and the transcripts and records of the state proceedings are not part of the files of the Federal Government. Access and use require misconduct and collusion, a matter quite susceptible of proof. But this is quibbling, since the very fact that a witness is called in a state crime investigation is likely to be based upon knowledge, or at least a suspicion based on some information, that the witness is implicated in illegal activities, which knowledge and information are probably available to federal authorities.

The danger that a defendant may not be able to establish that other evidence was obtained through the unlawful use by federal officials of inadmissible compelled testimony is insubstantial. The privilege protects against real dangers, not remote and speculative possibilities. *Brown* v. *Walker,* 161 U. S. 591, 599–600; *Heike* v. *United States,* 227 U. S. 131; *Mason* v. *United States,* 244 U. S. 362. First, one might just as well argue that the Constitution requires absolute immunity from prosecution wherever

the Government has obtained an inadmissible confession or other evidence through an illegal search and seizure, an illegal wiretap, illegal detention, and coercion. A coerced confession is as revealing of leads as testimony given in exchange for immunity and indeed is excluded in part because it is compelled incrimination in violation of the privilege. *Malloy* v. *Hogan, ante,* pp. 7–8; *Spano* v. *New York,* 360 U. S. 315; *Bram* v. *United States,* 168 U. S. 532. In all these situations a defendant must establish that testimony or other evidence is a fruit of the unlawfully obtained evidence, *Nardone* v. *United States,* 308 U. S. 338; *Wilson* v. *United States,* 218 F. 2d 754 (C. A. 10th Cir.); *Lotto* v. *United States,* 157 F. 2d 623 (C. A. 8th Cir.), which proposition would seem *a fortiori* true where the Government has not engaged in illegal or unconstitutional conduct and where the inadmissible testimony is obtained by a government other than the one bringing the prosecution and for a purpose unrelated to the prosecution. Second, there are no real proof problems in this situation. As in the analogous search and seizure and wiretap cases—where the burden of proof is on the Government once the defendant establishes the unlawful search or wiretap, *United States* v. *Coplon,* 185 F. 2d 629 (C. A. 2d Cir.); *United States* v. *Goldstein,* 120 F. 2d 485, 488 (C. A. 2d Cir.), aff'd, 316 U. S. 114—once a defendant demonstrates that he has testified in a state proceeding in exchange for immunity to matters related to the federal prosecution, the Government can be put to show that its evidence is not tainted by establishing that it had an independent, legitimate source for the disputed evidence. Since the Government has the relevant information within its control, valid prosecutions need not be sacrificed and infringement of the privilege through use of compelled testimony, direct or indirect, need not be tolerated. It is carrying a premise of perjury and judicial incom-

petence to excess to believe that this procedure poses any hazards to the rights of an accused. Third, greater requirements or difficulties of proof by a defendant inhere in the rule of absolute immunity. When a witness testifies under the auspices of an immunity act, the immunity he gets does not secure him from indictment or conviction. *Heike* v. *United States,* 217 U. S. 423. The witness must plead and prove, as an affirmative defense, that he has received immunity and that the instant prosecution is on account of a matter testified to in exchange for immunity, *Heike* v. *United States,* 227 U. S. 131, which may pose considerable difficulties where the relationship between the testimony and the prosecution is not obvious or where the immunity is acquired as a result of testimony before a grand jury or in an *in camera* administrative proceeding. See *Edwards* v. *United States,* 312 U. S. 473; 131 F. 2d 198 (C. A. 10th Cir.) (retrial), certiorari denied, 317 U. S. 689; *United States* v. *Lumber Products Assn.,* 42 F. Supp. 910 (D. C. N. D. Cal.), rev'd, *sub nom. Ryan* v. *United States,* 128 F. 2d 551 (C. A. 9th Cir.); *Lumber Products Assn.* v. *United States* (plea of immunity finally upheld after trial), 144 F. 2d 546 (C. A. 9th Cir.). Cf. *Pandolfo* v. *Biddle,* 8 F. 2d 142 (C. A. 8th Cir.).

*Counselman* v. *Hitchcock,* 142 U. S. 547, does not require that absolute immunity from state prosecution be conferred on a federal witness and the Court has declined on many occasions to so read it, the limitation of the privilege to one sovereign rationale aside, *Brown* v. *Walker,* 161 U. S. 591; *Adams* v. *Maryland,* 347 U. S. 179; *Ullmann* v. *United States,* 350 U. S. 422; *Reina* v. *United States,* 364 U. S. 507.[6] It does not therefore re-

---

[6] As MR. JUSTICE BLACK stated for the Court in *Adams* v. *Maryland,* a case dealing with the use of federally compelled testimony in a state proceeding "[A] witness does not need any statute to protect him from the use of self-incriminating testimony he is compelled to

quire that absolute immunity from federal prosecution be conferred on a state witness. Counselman, an officer of an interstate railroad, refused to reveal whether he engaged in discriminatory rate practices, a criminal offense, under the Interstate Commerce Act, before a federal grand jury investigating specific violations of that Act. The Court established for the first time that the coverage of the privilege extended to not only a confession of the offense but also disclosures leading to discovery of incriminating evidence, a matter of considerable doubt at the time. See *United States* v. *Brown,* 1 Saw. 531, 536, Fed. Cas. No. 14,671; *United States* v. *McCarthy,* 18 F. 87, 89 (C. C. S. D. N. Y.); *In re Counselman,* 44 F. 268 (C. C. N. D. Ill.). It then invalidated the first immunity statute to come before it because "[the statute] could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding . . . . It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on

give over his objection. The Fifth Amendment takes care of that without a statute." 347 U. S., at 181.

Neither Congress nor the States have read *Counselman* to mean that the Constitution requires absolute immunity from prosecution. There are numerous statutes providing for immunity from use, not prosecution, in exchange for incriminatory testimony. *E. g.,* 30 Stat. 548 (1898), 11 U. S. C. § 25; 18 U. S. C. § 1406; 49 U. S. C. § 9; 18 U. S. C. § 3486. Ala. Code, Tit. 9, § 39; Ala. Code, Tit. 29, § 171; Ariz. Rev. Stat. Ann., § 13–384; Ark. Const., Art. III, § 9; Cal. Const., Art. 4, § 35; Colo. Rev. Stat., § 40–8–8; *id.,* § 49–17–8; Conn. Gen. Stat. (1958 rev.), § 12–2 and § 12–53; Fla. Stat. Ann., § 55.59 and § 350.60; Idaho Code Ann., § 48–308 (Supp. 1963); Ill. Ann. Stat., c. 100½, § 4; Ky. Rev. Stat., § 124.330; Mich. Stat. Ann., § 7.411 (17); N. J. Rev. Stat., § 2A:93–9.

The effect of the rule petitioners urge would be to hold the above and numerous other statutes barring use but not prosecution unconstitutional.

which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted." 142 U. S. 547, at 564. In a dictum indicating that some immunity statutes are valid, the Court added that "a statutory enactment, to be valid, must afford absolute immunity against future prosecution *for the offence to which the question relates." Id.,* at 586. Whatever may be the validity of this dictum where the witness is being investigated by a grand jury for the purpose of indictment for a particular offense and where the grand jury proceedings are conducted by the same government attempting to obtain a conviction for the offense—the facts of *Counselman*—it clearly has no validity, and by its own terms, no applicability, where the inquiry does not concern any federal offense, no less a particular one, and the government seeking the testimony has no purpose or authority to prosecute for federal crimes.

The Constitution does not require that immunity go so far as to protect against all prosecutions to which the testimony relates, including prosecutions of another government, whether or not there is any causal connection between the disclosure and the prosecution or evidence offered at trial. In my view it is possible for a federal prosecution to be based on untainted evidence after a grant of federal immunity in exchange for testimony in a federal criminal investigation. Likewise it is possible that information gathered by a state government which has an important but wholly separate purpose in conducting the investigation and no interest in any federal prosecution will not in any manner be used in subsequent federal proceedings, at least "while this Court sits" to review invalid convictions. *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, at 223 (Holmes, J., dissenting). It is precisely this possibility of a prosecution based on untainted evidence that we must recognize. For if it is meaningful

to say that the Federal Government may not use compelled testimony to convict a witness of a federal crime, then, of course, the Constitution permits the State to compel such testimony.

"The real evil aimed at by the Fifth Amendment's flat prohibition against the compulsion of self-incriminatory testimony was that thought to inhere in using a man's compelled testimony to punish him." *Feldman* v. *United States*, 322 U. S. 487, 500 (BLACK, J., dissenting). I believe the State may compel testimony incriminating under federal law, but the Federal Government may not use such testimony or its fruits in a federal criminal proceeding. Immunity must be as broad as, but not harmfully and wastefully broader than, the privilege against self-incrimination.