### UNITED STATES of America
### v.
### Fred R. DORNAU et al., Defendants.
### No. 69 Cr. 718.

United States District Court,
S. D. New York,

June 4, 1973.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., for the United States; John J. Kenney, Asst. U. S. Atty., of counsel.

Patrick M. Wall, New York City, for defendant Fred Dornau.

London, Buttenwieser & Chalif, New York City, for defendant Peter Dornau; Franklin S. Bonem, of counsel.

METZNER, District Judge:

A hearing was held on defendants' motion to dismiss the indictment because allegedly it was founded on testimony given by defendants in bankruptcy proceedings in Florida pursuant to a grant of immunity. Section 7a(10) of the Bankruptcy Act (11 U.S.C. § 25).

The indictment against these defendants contains 45 counts. The first 29 counts concern only defendant Fred Dornau and charge him with defrauding the government by filing false invoices (18 U.S.C. § 287). Count 30 charges this same defendant with uttering and publishing as true a forged government contract (18 U.S.C. § 494). Counts 31 through 41 charge both Fred Dornau and his brother Peter Dornau with mail fraud (18 U.S.C. § 1341). Counts 42 through 45 charge both defendants with wire fraud (18 U.S.C. § 1343).

On March 2, 1973 this court granted defendants' motion to inspect the grand

jury minutes for the purpose of determining whether the indictment may have been impermissibly based on the testimony the defendants gave under the grant of immunity, 356 F.Supp. 1091 (S.D.N.Y.1973). Subsequently, the court denied the government's motion for reargument in which it had requested that the court review the grand jury minutes *in camera*, or, in any event, postpone any hearing until after the completion of the trial, 356 F.Supp. 1091, *supra*. The defendants were given until May 3 to examine the grand jury minutes and to move to dismiss the indictment if they were of the opinion that their immunity had been violated. May 30 had already been fixed as the trial date.

After reading the minutes, defendants moved for a hearing in order to determine whether the government had made any use of the privileged testimony of either of the defendants or of any evidence directly or indirectly derived therefrom. The hearing was then held at which time the inquiry was broadened to include evidence the government proposed to use on the trial. This course was dictated by language in the *Kastigar* case, discussed more fully later in this opinion. At the conclusion of the hearing defendants moved to dismiss the indictment.

■ The immunity granted by Section 7a(10) of the Bankruptcy Act is similar in language and scope to the immunity granted by 18 U.S.C. § 6002. It is commonly called use or derivative use immunity. The starting point for the discussion of the issues here is the decision in Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), which dealt with Section 6002. There the Court held that the scope of any immunity grant must be coextensive with a witness' Fifth Amendment privilege against compulsory self-incrimination, and that use immunity satisfies this requirement. The important point then to be considered in cases like this is whether the government's testimony

would have existed if the defendant had been permitted to refrain from testifying on the assertion of his Fifth Amendment privilege. In defining the protection use immunity would afford a witness, the Court in *Kastigar* said:

"Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." 406 U.S. at 453, 92 S.Ct. at 1661.

The denial of use for any purpose, of course, includes using it as an "investigatory lead" (*Id*. at 460, 92 S.Ct. 1653). Finally, the Court stated:

"One raising a claim under this statute need only show that he testified under a grant of immunity in order to shift to the government *the heavy burden* of proving that *all of the evidence it proposes to use* was derived from legitimate independent sources." (Emphasis supplied) *Id*. at 461–462, 92 S.Ct. at 1665.

On the hearing the government produced three witnesses. They were FBI Agent Sniegocki who was based in New York in 1968 and 1969 and who conducted the investigation in conjunction with this indictment; FBI Agent Smith of Florida who conducted a separate investigation of possible crimes committed in connection with the bankruptcy proceedings; and Mr. Kulleseid, a former Assistant United States Attorney, who handled this case through its presentation to the grand jury.

At the conclusion of the oral arguments after the hearing had been completed, I indicated that neither the grand jury testimony nor the prospective proof to be offered by the government in support of Counts 1 through 30 flowed directly or indirectly from the testimony given by Fred Dornau in the bankruptcy proceedings. His compelled

testimony did not touch the issues presented by these counts. I have been fortified in this conclusion by an *in camera* examination, consented to by defendants, of certain material submitted by the government. The motion to dismiss these counts is therefore denied.

We come now to Counts 31 through 45 which charge defendants with defrauding investors and lenders involved in Ra-Dor Industries, Inc. Ra-Dor primarily manufactured material in conjunction with defense contracts. The investigation of these defendants commenced in March 1968 on the complaint of the Defense Department that Ra-Dor had filed false claims in relation to government contracts held by that corporation. The interviews of witnesses by Sniegocki through December 1968 dealt solely with such an investigation, and the results thereof are contained in Counts 1 through 30. Sometime in the latter part of 1968, the FBI in Florida commenced a separate investigation of Ra-Dor regarding possible violations of the National Bankruptcy Act. Both of these investigations continued apace with frequent exchanges of information and mutual requests for local help in New York and Florida.

Nothing of consequence was done in the New York investigation from December to May 26, 1969, at which time four investigative interviews took place within two days. These interviews were concerned with the subject matter contained in Counts 31 through 45. The crucial factor here is that the defendants testified under a grant of immunity in the bankruptcy proceedings in Florida on May 1 and 9. There was another interview on July 15, 1969, and finally two additional interviews on September 10, 1969. It is interesting to note that sometime between July 8, 1969 and August 19, 1969, the caption of the investigative reports was enlarged from fraud against the government and the National Bankruptcy Act to include mail and wire fraud as well. Sometime between July 8 and August 4, 1969, the Assistant U.S. Attorney requested the FBI to conduct additional interviews to develop the possible mail fraud and wire fraud counts. It is impossible to pinpoint the exact date when this occurred.

It is clear from reading the files, the testimony of the defendants in the bankruptcy proceedings and the evidence in this case, that the interviews which took place beginning on May 26, 1969 did not flow from any compelled testimony by these defendants. The leads to those interviews were furnished to the FBI in Florida by Mr. Bernstein, an attorney for Ra-Dor's creditors in the bankruptcy proceeding. That information was then transmitted to New York and received by Sniegocki on April 12, 1969. This information was accompanied by a request that New York make specific investigations of Univance, Nuclear Research, Seegar, the attorney for some of Ra-Dor's creditors in New York, and Schnepps, Ra-Dor's attorney in New York. Finally, it is clear that the prospective government witnesses on this trial, Fiala, Billich, Baer and Ray, were all discovered and interviewed without relation to anything that appeared in the minutes of the testimony. Counsel for the defendants had a month within which to compare the grand jury testimony and the compelled testimony and have not furnished the court with any leads as to what may be considered tainted evidence.

What causes the problem in this case is that Kulleseid, on August 1, 1969, requested the United States Attorney in Florida to furnish him with the transcript of defendants' testimony in the bankruptcy proceedings. The transcript was received here on August 7. The grand jury had met on July 31 and August 4 at which time it heard testimony going only to Counts 1 through 30 of the indictment. The grand jury was then excused until August 28, when, for the first time, it heard some testimony regarding the counts with which we are concerned. The grand jury was then recessed until October 10 when it heard the bulk of the testimony regarding the

mail fraud and wire fraud counts and voted the indictment.

While the recollection of Kulleseid is not clear as to exactly when he read the transcript, at least it is fair to say that the government has failed to show that he had not read it before presenting any testimony to the grand jury on Counts 31 through 45. There are portions of the immunized testimony which relate to the subject matter of those counts. There are nearly fifty places in the transcript where Kulleseid made markings indicating questions and answers of interest to him. On the hearing he was unable (and I am sure this was a perfectly honest statement in view of the lapse of four years) to explain what the marked testimony could have meant to him either for the purpose of interrogating prospective witnesses or in presenting the case to the grand jury. In any event, there appears to be no reason why he had to read the transcript except to make sure his case was complete, to use the testimony to buttress what he already knew, or to fill in gaps with new information.

We have here one of the problems presented by the opinion in *Kastigar*. How do you make sure that a person who has testified under a grant of immunity will be protected against subsequent criminal charges to the same extent as if he had originally pleaded the Fifth Amendment? This is a matter of great concern and debate. *See* Note, Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli, 82 Yale L.J. 171 (1972) and The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 181 (1972). It is difficult for the court to speculate as to the effect that the reading of the minutes might have had on the conduct and thinking processes of the Assistant charged with the prosecution of the case.

 It appears to me that once the subject matter was touched upon in the privileged testimony, and the prosecutor had read it, he could have used it in a variety of ways in this criminal prosecu-

tion. The possibility of such use, and the impossibility of clearly showing that the use did not occur calls for the holding in this case that the defendants were denied the constitutional protection that their silence would have given them. Murphy v. Waterfront Commission, 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). The breadth of this ruling is justified by the language in *Kastigar* that the immunized testimony could not be used "in *any* respect."

Support for the conclusion reached here may be found in United States v. McDaniel, 449 F.2d 832 (8th Cir. 1971), cert. denied, 405 U.S. 992, 92 S.Ct. 1264, 31 L.Ed.2d 460 (1972). That case relied on Murphy v. Waterfront Commission, *supra*. Both of the cases were concerned with interjurisdictional immunity. However, *Kastigar* explicitly adopted the same rule of privilege where only one sovereign is concerned. In *McDaniel*, the court said 449 F.2d at 837:

"The circumstances of this case, however, are not ordinary, for we are faced with the fact that the United States District Attorney requested and received a transcript of the compelled state testimony. We conclude that this conduct violated the defendant's Fifth Amendment rights and constitutes a prima facie 'use' of the testimony which is prohibited by the *Murphy* exclusionary rule."

The question of whether the remedy for this violation of defendants' constitutional rights should be by way of suppression of evidence or by dismissal was determined by me in favor of the latter course in the prior opinion which initiated these proceedings. 356 F.Supp. 1091, *supra*. After the hearing and the clarification of the fact issues involved, my original views have been confirmed that in this case dismissal is the only proper remedy. It is impossible to suppress specific evidence in the light of the problem involved.

The motion to dismiss Counts 31 through 45 is granted.

So ordered.