OPINION OF THE COURT
Eve Preminger, J.
FACTS
In the summer of 1973, the entrepreneurs involved in the instant murder indictment were enjoying the friendship and harmony typical of many successful business relationships. Frank Lucas, the chief defendant, was head of a heroin empire that had flourished for over a decade. George Ford, the victim, was one of Lucas’ retailers supplying upper Manhattan. Charles Morris and Warren Sims were middle management executives.
On the wholesale supply side of the enterprise, two ex-war heroes, Leslie “Ike” Atkinson and Herman Jackson, with the unwitting assistance of the United States Army and its *673 airplanes, controlled the importation of heroin from the Far East. The codefendant, Martin Trowery, accused of shooting George Ford at the behest of defendant Lucas, worked for Atkinson and Jackson.
The deceased Ford was one of the first to embark upon a career change that would eventually claim all the persons mentioned above. In 1974, after he and Lucas had been indicted by the Federal authorities in a large drug conspiracy case, Ford agreed to co-operate with the government against Lucas. The term of his co-operation was abbreviated, for on July 24, 1974, Ford was shot down on the street near his candy store. With Ford’s demise, the government’s narcotics case collapsed and Lucas was acquitted.
This event did not deter other Lucas henchmen from switching allegiances. Morris and Sims had also signed up as co-operating witnesses for both Federal and State authorities. Morris provided information linking Lucas to the Ford homicide. Sims, for his part, implicated Lucas in a number of other drug-related killings, but supplied no information concerning the Ford homicide. The District Attorney concluded that the testimony of Morris was not sufficient to prevail in a prosecution against Lucas for the killing of Ford. The murder file lay dormant for a number of years— until 1978.
The luck of Lucas & Co., however, had begun to run out. In 1977 Lucas was convicted (through information given by Sims and Morris) of two narcotics conspiracies and sentenced to consecutive terms totaling over 70 years. Atkinson and Jackson had already received substantial sentences in other drug cases, as had Martin Trowery.
None of these setbacks diminished the group’s dedication to the principle of free enterprise. Lucas, Atkinson and Jackson continued to run their narcotics concern from their jail cells. Success hinged upon their ability to hire lawyers who would turn the constitutionally protected access of attorney to incarcerated client into a cover for an entirely new relationship, that of courier and boss. Finding such lawyers did not prove difficult.
When New York authorities acquired enough co-aperating witnesses to pierce the prison-run narcotics cartel, *674 Lucas was once again indicted. He, too, decided to join the government’s team in the hope of reducing his sentences. In May of 1977, Lucas was promised full use immunity for his co-operation. Working as diligently as ever in his new government job, Lucas provided enough information to make cases against a number of attorneys and other narcotics kingpins, including his former associates, Leslie Atkinson and Herman Jackson.
During his period of co-operation, Lucas consistently denied knowledge of or involvement in any homicides, including that of George Ford.
In what now seems like a chain reaction, the newly indicted Atkinson and Jackson, having been betrayed by Lucas, also decided to co-operate. In September of 1978, they told New York detectives that Martin Trowery (who was at that time co-operating against them in Pittsburgh) was the shooter in the Ford homicide, and that Lucas was the purchaser of Trowery’s services. This new LucasTrowery-Ford lead caused the New York Special Prosecutor to reopen the dormant Ford murder investigation.
Meanwhile, two days later and a thousand miles away, former Lucas employee, Warren Sims, whose previous role as a government informant had terminated, chanced to encounter Martin Trowery in a witness protection unit in Chicago where they were both incarcerated. Sims telephoned his former employers in the New York Special Prosecutor’s office and claimed that Trowery admitted to him that he had killed Ford for Lucas. Sims recalled, for the first time, that he and Lucas had had a similar conversation three years earlier in which Lucas also acknowledged his involvement in the Ford killing.
This new evidence from Atkinson and Jackson on the one hand, and from Sims on the other, added to the information already possessed by the prosecutor in 1975, led to the instant indictment of Lucas and Trowery.
LEGAL ISSUES
Defendant Lucas contends that but for his co-operation in 1977 he would never have been indicted for the Ford homicide. This court has already found that in exchange for *675 his co-operation he was promised full use immunity. The legal consequences of that promise were that the government could not use his testimony, or any leads derived therefrom, against him in any way. He contends that this promise has been violated in two important respects: (1) the testimony of Atkinson and Jackson caused the reopening of the Ford homicide investigation and would not have been obtained without Lucas’ testimony against them; and (2) the testimony of Warren Sims was also “derived” from Lucas’ testimony in that Martin Trowery would not have made the statements to Sims if Trowery had not been angered by Lucas’ co-operation.
The People concede that Atkinson’s and Jackson’s testimony is tainted as to Lucas and may not be used against him at trial. They state, however, that even if this tainted testimony which caused the reopening of the Ford homicide investigation had not existed, the homicide investigation would have been reopened when Sims provided them with information which would have caused them to refocus on Lucas.
They oppose defendant’s second contention, that Sims’ testimony is tainted, as an overly broad interpretation of the doctrine of use immunity.
Despite our reverence for an individual’s right to refrain from self incrimination, it has long been recognized that the government has a competing need for access to information concerning otherwise unfathomable criminal activity. To enable the government to gain such information, official pardons have been granted for centuries to valuable witnesses in exchange for their incriminating testimony. (Lord Chancellor Macclesfield’s Trial, 16 How St Tr 767, 1147.)
In 1857, the first Federal immunity statute (11 US Stat 155) declared that a person who testified before Congress was protected from future prosecution for anything that he mentioned in his testimony. Those with voluminous criminal resumes now welcomed the chance to testify to cleanse their records in what became known as “immunity baths”. Alarmed by its unnecessary largesse, Congress amended the statute (12 US Stat 333) to restrict a witness’ protection to suppression of the evidentiary use of the actual *676 testimony given. This form of protection was called “simple use” immunity.
In Counselman v Hitchcock (142 US 547), the Supreme Court invalidated the amended statute. In order for an immunity statute to be constitutional, the court held, it must afford the witness protection coextensive with what was available to him through his silence (supra, pp 585, 586). The simple use statute did not meet the coextensiveness test, because a witness might still be prosecuted through the use of leads derived from his testimony. The court stated that an immunity statute would be valid only if it afforded “absolute immunity against future prosecution for the offense to which the question relates” (supra, p 586).
Within weeks of the Counselman decision, Congress introduced a statute which employed what became known as transactional immunity (27 US Stat 443); its focus was the implementation of the broad protection thought required by Counselman. Transactional immunity protects an immunized witness from any criminal prosecution related to a crime revealed in his immunized testimony, even if that testimony is not used against him.
Because an individual who confessed to criminal acts under a grant of transactional immunity could henceforth avoid all prosecutions related to the topics of his testimony, law enforcement officials were eager to see the scope of transactional immunity restricted. However, subsequent cases never directly answered the question whether anything less than transactional immunity could be sufficient (see, e.g., Smith v United States, 337 US 137; Shapiro v United States, 335 US 1; United States v Murdock, 284 US 141; Heike v United States, 227 US 131). This issue was not resolved until 1964, when the Supreme Court decided one case which expanded the reach of the Fifth Amendment and another which constricted the scope of immunity grants. In Malloy v Hogan (378 US 1), the court applied the Fifth Amendment to the States through the Fourteenth Amendment, which resulted in the States being required to grant immunity from future prosecution when compelling testimony. An obvious question arose as to whether a State’s grant of transactional immunity would also preclude the *677 Federal Government from prosecuting the immunized individual. (Murphy v Waterfront Comm., 378 US 52, decided with Malloy v Hogan, supra), resolved this inter jurisdictional dilemma. Murphy held that where the prosecuting jurisdiction was different from the one in which the testimony was compelled, use and derivative use (also called “use plus fruits”) immunity was sufficient. In other words, even if a State granted transactional immunity, the Federal Government could still prosecute the immunized individual, as long as it did not make any use of his immunized testimony. The court noted that this rule would not only leave the witness and the prosecuting jurisdiction in substantially the same position as if the witness had claimed his Fifth Amendment privilege and been permitted to remain silent, but would also facilitate the gathering of information necessary for effective law enforcement.
Congress quickly recognized the decision as signaling that some compromise between simple use and transactional immunity would satisfy constitutional requirements. It enacted a new use immunity statute which provided that when a witness testifies under a grant of immunity “no testimony or other information compelled under the order (or any information directly -or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.” (US Code, tit 18, § 6002; emphasis added.)
The constitutionality of this provision was upheld in Kastigar v United States (406 US 441), which deemed the scope of the new statute coextensive with the Fifth Amendment’s protection against self incrimination and therefore free from constitutional defect. The court emphasized that the statute provided a “sweeping proscription” which “prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness”. (Supra, pp 453, 460.) To emphasize its “in any respect” proscription, the court said (p 460): “This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony *678 as an ‘investigatory lead/ and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures”.
To forestall criticism that the statutory prohibition against any use might be difficult for a defendant to enforce, the court assigned to the prosecutor the “heavy burden” of affirmatively proving both that he has not used the immunized testimony and that he has obtained his evidence from completely independent legitimate sources, so that (supra, p 460) “ ‘Once a defendant demonstrates that he has testified, under a * * * grant óf immunity to matters related to the * * * prosecution, the * * * authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.’ 378 U.S., at 79 n. 18. This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.”
The court described the government’s duty as a (supra, p 461) “very substantial protection, commensurate with that resulting from invoking the privilege itself.”
Kastigar thus ratified the Congressional retreat from the total forgiveness of transactional immunity to the more limited benevolence of use immunity. The intent of Congress and the court was clearly to limit the scope of immunity protection to the minimum required by the Fifth Amendment. Nevertheless, post -Kastigar cases have demonstrated that use immunity protection often covers more ground than its transactional predecessor. In fact, in some situations it may provide a wider and more comprehensive shield than was ever contemplated by Kastigar.
Unlike transactional immunity, which limits its protection to the subject about which the witness testifies, use immunity may extend to crimes never mentioned in the immunized testimony. For example, in United States v Kurzer (534 F2d 511), the Second Circuit held that the protective cloak of use immunity was broad enough to preclude the government’s use of evidence given by a person *679 in retaliation for being named in, and indicted by a witness’ immunized testimony. In that case, an accountant, Kurzer, agreed to testify against his client, Steinman, under a grant of use immunity. When Steinman was indicted, in part because of Kurzer’s testimony, he agreed to co-operate when he learned from the government that his accountant had supplied the evidence against him. He then provided information which led to Kurzer’s indictment on other tax crimes.
The Second Circuit held that defendant Kurzer’s indictment was “derived” from his prior immunized testimony, and was therefore inadmissible if the witness Steinman (supra, p 517) “was led to cooperate with the Government by an indictment secured through the immunized testimony”. For the first time, an incriminating witness’ motive in coming forward became relevant in determining whether derivative use had been made of another witness’ immunized testimony. If retaliation played some part in the witness’ decision to come forward, the Kurzer court stated the government will be unable to meet its “heavy burden” of showing that the defendant would have been indicted even if he had never provided immunized testimony (supra, p 517).
Kurzer and its progeny (see, e.g., United States v Nemes, 555 F2d 51; United States v Quatermain, 467 F Supp 782; United States v Pellón, 475 F Supp 467; United States v Romano, 583 F2d 1; United States v Ceccolini, 542 F2d 136) require extensive investigation into the motives of witnesses to rule out the possibility that they were induced to testify because of a defendant’s prior immunized testimony. Testimony is then often excluded which seems to have little relationship to the original immunized testimony.
Another line of cases which involves nonevidentiary use of immunized testimony also extends the protection of use immunity beyond traditional concepts. In United States v McDaniel (482 F2d 305), United States v Dornau (359 F Supp 684), and United States v Rice (421 F Supp 871), the respective prosecutors were able to show that they had evidence independent of defendant’s immunized testimony sufficient to prosecute. However, they also had read tran *680 scripts of the target defendant’s immunized testimony prior to securing indictments. In each case the court concluded that the reading of immunized testimony mandated the dismissal of the indictment because it would be impossible for the prosecutor to show that he had not made some “use” of the immunized testimony. Although, aware of the unusual “breadth of this ruling”, in United States v Dornau (supra, p 687), the court concluded that it was. “justified by the language in Kastigar that the immunized testimony could not be used fin any respect’ ”, and the McDaniel court agreed that the prosecutor’s reading of the Grand Jury testimony was “use [that] could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy” (supra, p 311), all of which it held proscribed by Kastigar.
In the instant case, defendant Lucas is seeking to combine Kurzer and McDaniel to obtain a similar result. Lucas asserts that Atkinson and Jackson are to him as Steinman to Kurzer, because they would not have come forward with their information about the Ford homicide if they had not themselves been indicted as a result of Lucas’ immunized testimony against them. This argument is factually correct insofar as it goes. There is no question that Jackson’s and Atkinson’s testimony became available as a result of Lucas’ testimony and is, in that sense, derived therefrom and tainted as to Lucas. The more difficult question is what consequences flow from that taint. Unquestionably, their testimony may not be used against Lucas at trial, and this court had^ impliedly so ruled when the Lucas trial was severed from that of his codefendant Martin Trowery. But Lucas argues that more than the exclusion of the tainted testimony is required. He points out that it was this tainted information which caused the reopening of the investigation against him, which he categorizes as a nonevidentiary use specifically envisioned (Kastigar v United States, 406 US 441, 460, supra) and prohibited by Kastigar. He contends that even if the government has independent, untainted evidence, it may not proceed if, in the first instance, the impetus was obtained from his immunized testimony. *681 He compares his situation to the one where a prosecutor is prohibited from proceeding with independent evidence because he has read immunized Grand Jury minutes (see United States v McDaniel, 482 F2d 305, supra; United States v Dornau, 359 F Supp 684, supra; United States v Rice, 421 F Supp 871, supra). A logical progression of the McDaniel, Dornau and Rice reasoning would indeed support the defendant’s position. But this court does not believe that the conclusions reached in these cases can withstand careful analysis. To dismiss the indictment in the instant case would mean that a prosecutor may be barred from using concededly untainted testimony, obtained prior to even the possibility of taint, merely because' the existence of tainted information had reopened an investigation. Such a doctrine would require detailed examination into not only a witness’ motive for testifying, as required by United States v Kurzer (534 F2d 511, supra), but also into a prosecutor’s thought processes, priorities and discretionary decisions, all areas traditionally free from judicial scrutiny. (See, e.g., Hoffa v United States, 385 US 293; United States v Marion, 404 US 307; United States v Lovasco, 431 US 783.)
It would also extend the scope of use immunity beyond anything contemplated by Kastigar v United States (406 US 441, supra), and beyond the key constitutional requirement of immunity grants: to place the witness in the same (not better) position he was in prior to testifying.
If use immunity grants can sully prior information possessed by the prosecutor, as suggested here, then a witness receives an even more cleansing “bath” than ever afforded by transactional immunity. Kastigar clearly intended no such result. When it talked of prohibiting “the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures” (supra, p 460; emphasis added), it could not, by definition, have meant to include evidence obtained prior to the witness’ compelled disclosures, which is the situation in the instant case. In other words, the focusing prohibited by Kastigar is that which leads to the discovery of new evidence, not to the use of old, untainted evidence. This distinction was recognized in United States v Catalano (491 F2d 268, 272), where *682 the Second Circuit avoided following McDaniel (482 F2d 305, supra) by stressing that the prosecutor in McDaniel had failed to show “prior knowledge of the information revealed by the grand jury testimony”. (See, also, United States v Meyers, 339 F Supp 1154; but see United States v Dornau, 359 F Supp 684, supra; United States v Rice, 421 F Supp 871, supra.)
As the Supreme Court stated in United States v Crews (445 US 463, 475) : “The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.”
This court therefore holds that the use immunity protection does not “reach backward” to require exclusion of evidence possessed prior to receipt of the immunized testimony, even if the prosecution was motivated to reexamine that evidence by its exposure to tainted information. Defendant’s motion for dismissal based on the “use” of Atkinson’s and Jackson’s testimony is denied.*
The right of the government to use Sims’ information requires separate analysis, for Sims’ information was obtained after Lucas’ two years of extensive co-operation. Defendant’s claim that Sims’ information is derived from his immunized testimony is based upon a rather ingenious tracing of the source of Sims’ information, i.e., Lucas’ co-defendant, Martin Trowery. It is defendant’s somewhat speculative contention that Martin Trowery admitted his involvement in the Ford homicide to Warren Sims only because he was angry with Lucas for co-operating. Defendant further speculates, unsupported by any hearing evidence, that it was only Martin Trowery’s revelation to Sims that caused Sims to “recollect” Lucas’ own prior admission to Sims of ordering the Ford homicide. Thus, if Lucas had not co-operated, and Trowery had not been angered by his *683 co-operation, Sims would not have given the government his information.
Assuming for the moment the validity of these psychological conjectures, it is still necessary to decide whether Sims’ statements to the government are sufficiently causally connected to Lucas’ immunized testimony to be considered “derived” from it.
In determining whether testimony is so derived, Kastigar (406 US 441, 462, supra) defines the crucial question as whether, after the immunized testimony, “the witness and the prosecutorial authorities [are] in substantially the same position as if the witness had claimed the Fifth Amendment privilege”. (Emphasis added.) The use of the word “substantially” would seem to imply that there should be some limitations on stringing together a causal chain and inferring therefrom that the final event (the challenged evidence) is legally derived from the original event (the immunized testimony). Given the complexity of modern criminal litigation and the proliferating use of immunized testimony, it would probably be possible to construct some causal link in almost any immunity situation.
Some test needs to be established to determine the appropriate method for determining whether a piece of evidence is too remote from the immunized testimony to be considered to be derived from it. Otherwise, use immunity will become far more expansive than transactional immunity and will create an avalanche of pretrial hearings exploring motives, causal relationships, and psychological probabilities, on a level generally left to philosophers or Freudian analysts.
It has been suggested that the appropriate solution would be to require the prosecutor to certify before a court all evidence he possesses against a defendant before he grants use immunity and be confined to that evidence forever (82 Yale LJ 171, 182-183). While this solution has the virtue of clarity, it would prohibit the government from continuing an investigation or obtaining new legitimately independent evidence, and therefore seems unduly restrictive. On the other hand, causal tests developed in coerced confession and Fourth Amendment cases are not restrictive enough.
*684 The Supreme Court has expressly ruled that the limitations of the exclusionary rule as applied in coerced confessions are not applicable to immunity situations. The balancing test that is used in confession cases (see, e.g., Harris v New York, 401 US 222; Oregon v Hass, 420 US 714) is inconsistent with the requirement that the grant of immunity “ ‘leave defendant and the State in the position each would have occupied had defendant’s claim of privilege * * * been honored.’ ” (New Jersey v Portash, 440 US 450, 453.)
The limitations on exclusion used in Fourth Amendment cases are similarly inappropriate. The Fourth Amendment is aimed primarily at protection of privacy and deterrence of police conduct which invades that privacy. The doctrine of attenuation therefore has been developed to limit the exclusion of evidence derived from a Fourth Amendment violation to situations where the link between the evidence and the initial illegal act is concrete enough to enable the police to appreciate the disadvantage caused by their illegal conduct. For that reason, evidence may be introduced which has “ ‘become so attenuated as to dissipate the taint’ (Wong Sun v United States, 371 US 471, 491.) But the immunity doctrine is not intended to deter unlawful police conduct and thus the attenuation doctrine has little utility.
Unlike the Fourth Amendment, the immunity doctrine is not designed to deter prosecutors from future violations, but rather to protect a witness from testifying when he is constitutionally entitled to remain silent. If the possibility of incriminating himself through his testimony is so remote that it would not have caused him to assert his Fifth Amendment right, then the causal link is no more than the “remote and speculative possibilities” which the constitutional privilege does not protect against. (Murphy v Waterfront Comm., 378 US 52,102, supra.)
It is therefore relevant to examine, in an immunity situation, the effect upon the defendant witness rather than the effect upon law enforcement. That is, a court must determine the point at which the possibility of abuse becomes so remote that a witness will not have reasonable anxiety over testifying, rather than the point at which it would have no motivational effect on prosecutorial behavior.
*685 A defendant who decides to relinquish his Fifth Amendment right in exchange for a use immunity contract must be protected from all of the reasonably foreseeable consequences of that decision, as most liberally construed, under all of the possible circumstances. In the instant case, however, the connection between defendant Lucas’ immunized testimony and Sims’ revelations is indeed no more than a remote and speculative possibility. At the time of Lucas’ decision to co-operate, for him to have wavered on the ground that Trowery might learn he was co-operating and become angered and exercise that anger by confiding in a chance acquaintance who, unbeknownst to Trowery, possessed information that would be revived by Trowery’s revelation, would have been more than speculative; it would have been clairvoyant. Such situations are not covered by the Fifth Amendment, and are thus by definition not within the ambit of the protection afforded by an immunity agreement which is designed to supplant, not increase a defendant’s Fifth Amendment rights.
Accordingly, this court finds that the testimony of Warren Sims is not tainted as to defendant Lucas and may be offered at the trial.

 In its brief the government points out that even if this court were to reach a contrary result, dismissal would be unwarranted because Sims’ revelations, which occurred two days after receipt of the tainted information, would also have caused the reopening of the investigation and likens this to the “inevitable discovery doctrine” (People v Fitzpatrick, 32 NY2d 499). In view of the court’s ruling, it is unnecessary to pass upon this contention. (But see 56 Texas L Rev 791, 828-829.)