BOWES, Judge.
Defendant, William Peterson, a/k/a Bill Lance, along with a co-defendant, Robert L. Gordon, were, on May 18, 1982, charged by a bill of information with a violation of R.S. 14:64, armed robbery. On November 2, 1982, a defense “Motion to Quash Bill of Information/Suppress Confession, filed by Peterson, was tried and, on the following day, denied. Subsequently, on March 24, 1983, pursuant to a plea bargain, defendant Peterson withdrew his plea of not guilty and entered a plea of guilty to a reduced charge of simple robbery (LSA R.S. 14:65) but reserving his right to appeal under State v. Crosby, 338 So.2d 584 (La.1976) the adverse ruling on his motion to suppress (Assignment No. 1).
In 1980, William Peterson was charged with federal mail fraud and entered into a federal plea bargain agreement, in which he was granted immunity from prosecution. At the plea bargain session, Mr. Peterson was encouraged by his then attorney, Mr. James McPherson, to make a full disclosure of all federal and state criminal activity of which he was then aware [Mr. Peterson was encouraged “to come to Jesus” (the federal government) and to even ‘tell about the Kennedy assassination’ if he knew anything about that].
The pertinent portion of the plea bargain executed by the defendant and the U.S. Justice Department attorneys follows:
c. The Government will not prosecute the defendant for any and all criminal violations based upon information and testimony and evidence derived therefrom provided by the defendant during the course of his cooperation with law enforcement, [emphasis ours].
Mr. Peterson continued to be a cooperating federal witness up until his arrest by the Jefferson Parish authorities on or about April 28, 1982.
In August 1981, during the period Mr. Peterson was cooperating as a federal witness, and under his federal immunity, the defendant had occasion (via a letter) to advise Mr. Glenn Burns, a federal prosecutor, of a certain armed robbery in which he had been involved some years before (July 1979) in Jefferson Parish, La. The letter implicated Robert Gordon, who was, then, also under federal investigation and was written by Mr. Peterson in an attempt to underscore his warning to the federal authorities that agents attempting to arrest Mr. Gordon should consider him armed and dangerous. The letter also detailed other information relative to Gordon such as where some guns might be hidden, other crimes in which the two were involved and leads on the whereabouts of Gordon’s parents (and hence to the whereabouts of Gordon himself).
At the time Peterson wrote the inculpato-ry letter to the U.S. Attorney, he was in jail awaiting a hearing on a motion to have his sentence reduced. He had already given the government all the information he had on the airline ticket/mail fraud and, in July of 1981, one month before his scheduled sentence reduction hearing, Peterson had supplied to the federal authorities valuable information which enabled them to thwart the planned take-over of Dominica by a band of mercenaries.
Peterson’s sentence reduction hearing was to have been held August 19, 1981, but, for some unknown reason, was delayed. During the period August 19-24, 1981, Peterson stated (in his letter) that he was not permitted to contact his attorney or anyone on the New Orleans federal strike force; he did not know why his hearing had been postponed; and, as evidenced by the contents of his letter to Glen Burns, was beginning to panic.
It is obvious to us that Peterson’s letter of August 24, 1981, to Glen Burns, represented a last ditch effort by Peterson to further convince the federal authorities that he had indeed disclosed to them all information regarding criminal activity which he possessed, and that, because of this cooperation, he expected them to honor their end of the bargain and assist him in having his sentence reduced.
We find it significant that Peterson’s sentence was reduced the next week follow *1133 ing his letter, and, shortly thereafter, Peterson, after being briefly held on two de-tainers by Jefferson Parish, was released to return to his home in New Jersey (both charges were dismissed with the assistance of a letter dated September 24, 1981, from the U.S. Department of Justice to the Jefferson Parish District Attorney’s office).
The defendant-appellant was finally arrested on the armed robbery charge at 8:30 p.m., April 28,1982. Mr. Peterson testified that he had been advised by attorneys employed by the U.S. Justice Department that he would probably be arrested by Jefferson authorities for armed robbery, but his arrest would simply be a matter of formality and that, as in September of 1981, the charge would be dropped and he would be released. In fact, Mr. Peterson was arrested by Jefferson authorities while he was in the U.S. Attorney’s office.
The following is of monumental import. We find the evidence and testimony made evident that both Peterson and the federal authorities considered him still bound by his plea bargain in April 1982. This is substantiated by the fact that the federal authorities, on April 23, 1982, transported Mr. Peterson to New Orleans from New Jersey, where he was then living, to testify for the government. Additionally, after Peterson arrived in New Orleans, he was used by the P.B.I. to tape a conversation with Robert Gordon, thus still evidencing complete cooperation in accordance with the plea bargain agreement.
It was only after the conversation with Gordon was taped that the inculpatory letter of August 1981 was turned over to Jefferson authorities and Peterson was arrested.
There is little doubt in our minds the only reason William Peterson cooperated with Jefferson Parish law enforcement personnel and gave them a confession was he believed he still had immunity and was simply completing some “formalities” in order to effect his release. He was too well-schooled in criminal activities to do otherwise. Further, we find the conclusion inescapable that the only evidence the state had against Mr. Peterson arose directly out of the federal investigation in which Peterson had been granted immunity. At the suppression hearing, Jefferson Parish assistant district attorney, Gordon Konrad, testified as follows:
Q. Now with respect to the armed robbery matter, are you aware of the circumstances under which it came to the attention of the District Attorney’s office?
A. Yes.
Q. Could you describe those circumstances for me please.
A. I was contacted either Mr. Mamoul-ides asked me to contact, I think it would have been Mr. A1 Winters with the U.S. Attorney’s office in New Orleans and after that contact he said that or asked if I would come over to their office, that during the course of a matter in which they were investigating and prosecuting they had uncovered evidence of what appeared to be an armed robbery in Jefferson Parish and they wanted to disclose that to our office and I went over and called, or prior to going over I called the detective bureau for Jefferson Parish and told them the situation and asked if they would assign an officer to the matter to go over with me because the U.S. Attorney at that time couldn’t pinpoint the date, place, victim of the armed robbery, as I recall it. I met with Mr. Winters along with one or two other assistants with the U.S. Attorney’s office and Detective Gordon....
Q. What evidence did you receive of the armed robbery?
A. They said someone that was prepared to testify for them or had cooperated with them in the past to disclose to them facts surrounding an armed robbery that had occurred a number of years before in the parish of Jefferson. They gave me a copy of a letter which I think this is a Xerox of the same letter. This letter marked D-5. They also had a transcript of tape which I understand had been recorded during a *1134 conversation between Mr. Peterson and they didn’t refer to him as Mr. Peterson. They referred to him as, what is the other name on the bill?
Q. Mr. Lance.
A. I think it was Mr. Lance between Mr. Peterson and Mr. Gordon and it was a partial transcript of that tape that was furnished to me that day.
[[Image here]]
Q. Now had you had any knowledge of the armed robbery before the letter D-5 and the transcript of the tape were given to you by the U.S. Attorney?
A. I personally didn’t have any. I was not aware of the armed robbery, no.
[[Image here]]
MR. WILSON:
Q. Isn’t it a fact that outside of this letter you would never have learned of this armed robbery?
A. I don’t have any idea whether we would have learned of the armed robbery in another way....
Additionally, the facts that no charges were filed against the defendant before April 1982 and that the robbery had taken place one year prior to the plea agreement, two years prior to the letter and almost three years prior to the indictment, buttress our conclusion that the state authorities had no independent information or evidence which would have focused their investigation on Mr. Peterson.
Although we have found no Louisiana cases on point, there are a number of federal cases which have dealt with the issue of cross-jurisdictional immunity. In Murphy v. Waterfront Com’n of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the court was presented with “the fundamental constitutional question of whether, absent an immunity provision, one jurisdiction in our federal structure may compel a witness to give testimony which might incriminate him under the laws of another jurisdiction.” The defendant-petitioners had been given immunity from prosecution under the laws of New Jersey, but still refused to testify because their statement might tend to incriminate them under federal law. The court held “that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law.” Supra, 84 S.Ct. at 1609. This holding squarely meets the provision of La.C.Cr.P. Article 703(B) which mandates that a motion to suppress must be based on a constitutional ground.
While the aforementioned case dealt with the circumstances surrounding the making of an inculpatory statement, a second line of federal caselaw deals with the viability of information gained as the result of a defendant’s confession. In Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the court sought to resolve “whether testimony may be compelled by granting immunity from the use of compelled testimony and evidence derived therefrom (“use and derivative use” immunity), or whether it is necessary to grant immunity from prosecution for offenses to which compelled testimony relates (“transactional” immunity) [citation omitted]”. The court found that once a defendant had testified under a state grant of immunity on matters related to a federal investigation, it was incumbent on the federal authorities who wished to prosecute the defendant to prove that their evidence was not tainted because they had an independent source of information. “This burden of proof ... is not limited to a negation óf taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." (Emphasis ours) Supra, 92 S.Ct. at 1665. Not only was the federal prosecutor barred from using the statement as an investigatory lead, but also from the use of any evidence garnered by virtue of the investigation having been focused upon him following his statement. See also Appeal of Starkey, 600 F.2d 1043 (8th Cir.1979); Gunsby v. Wainwright, 596 F.2d 654 (5th Cir.1979); *1135 United States v. Jones, 542 F.2d 186 (4th Cir.1976); and United States v. Barker, 542 F.2d 479 (8th Cir.1976).
United States v. Barker, 542 F.2d 479, 482 & 483 (8th Cir.1976) held that “[i]t is clear beyond doubt that one sovereign’s grant of immunity is not ipso facto binding on another sovereign.” _ “It is also clear, however, that once a state does compel a defendant’s testimony through an immunity grant, the federal Government cannot take advantage of that testimony in order to obtain a conviction.”
Three years later, in Appeal of Starkey, supra, the same court stated:
[5,6] The prosecuting government bears a very heavy burden in proving, once a witness has been given immunity, that subsequent evidence against that individual is not “tainted” by the immunized testimony, [citations omitted]. In order to meet this burden, the prosecuting government must show it did not use any immunized testimony, directly or indirectly, as an investigatory lead, or to focus investigation upon a person. Kastigar v. United States, supra....
While it is repugnant to this court to order the repression of admissions of guilt by a repeated lawbreaker, the law and jurisprudence that control the decision in this case leaves us no choice. Because the defendant, William Peterson, believed that he had total immunity and because of the complete absence of any independent information whatsoever, we are compelled to conclude that the use of the defendant’s letter and statement as evidence or as an investigatory lead to focus investigation upon Peterson in connection with this armed robbery charge, violated his Fifth Amendment right against self-incrimination and therefore should have been suppressed. To do otherwise would sanction a clear breach of good faith by federal authorities and greatly discourage informers from giving valuable information to law enforcement authorities. We feel this would militate strongly against the public interest.
In so holding, we do not intend to criticize the office of the District Attorney in Jefferson Parish for prosecuting Peterson. We can understand how they considered it their duty to prosecute in light of the information given them by federal authorities. Nevertheless, it is the duty of the courts to strike down such prosecution where it is manifestly violative of a defendant’s constitutional rights, as in this case.
Because of our ruling herein, we find it unnecessary to address appellant’s second allegation of error that the trial judge failed to properly delineate his reasons in imposing sentence, which sentence he claims was nonetheless excessive.
Accordingly, for the reasons stated above, we reverse the ruling of the trial judge on the motion to suppress, order the suppression of the defendant’s inculpatory letter of August 24, 1981, his confession following his arrest, and any and all evidence derived from either of these sources. Further, we vacate the defendant’s plea and sentence and remand this ease for proceedings consistent with this opinion.
REVERSED, VACATED AND REMANDED.